**WHEELING–PITTSBURGH STEEL CORP., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1568.

United States Court of Appeals, Third Circuit.

Argued Feb. 11, 1980.

Decided April 14, 1980.

Donald L. Dotson (argued), Francis P. Massco, Pittsburgh, Pa., for petitioner.

Candace M. Carroll (argued), Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Before ADAMS, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

Wheeling-Pittsburgh Steel Corporation (the Company) petitions this court for review of the April 30, 1979, decision and order of the National Labor Relations Board (the Board). The Board cross-applies for enforcement of its order. The Board found that the Company had committed unfair labor practices in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (3),[1] by suspending two employees for invoking their contractually protected right not to work under conditions they believed to be unsafe. The Board also found that the Company had violated § 8(a)(1) of the Act due to a remark made by a foreman concerning the length of the suspension. Based on the findings of unfair labor practices, the Board ordered the Company to rescind the suspensions, to delete any references to the suspensions from the personnel files, to compensate the two employees for the earnings they lost while suspended, to cease and desist from engaging in the unfair labor practices, and to post notices informing the employees that they will not be subjected to these or similar unfair labor practices. We will deny the petition for review and enforce the Board's order insofar as it relates to the suspension of the two employees. We will grant the Company's petition and deny enforcement of those portions of the order relating to the foreman's remark.[2]

---

1. 29 U.S.C. § 158(a) provides in pertinent part:
 "§ 158. Unfair labor practices
 "(a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

2. Because we have decided that the Board properly exercised its discretion in not deferring to arbitration in view of the record in this case (see II, *infra*), we will deny the motion

## I.

The Company produces steel and steel products. Its facility at Allenport, Pennsylvania, converts semifinished steel into sheet and tubular products. Approximately 2600 employees work at the Allenport facility; of these, 2400 are represented by the United Steelworkers of America (the union). Section 14(C) of the 1977–1980 collective bargaining agreement between the Company and the union provides that employees who believe their working conditions are abnormally unsafe or unhealthy are entitled to refuse to work without losing their right to return to their jobs.[3] This provision has been included in the collective bargaining agreements since the Company was formed in 1969. The agreement also contains a grievance and arbitration procedure, a no-strike clause, and a provision that an employee cannot be suspended more than five days without a hearing.

In Building Number 5 at the Tube Mill at Allenport, tubes and pipes are received, cut, threaded, painted, tested, inspected, and loaded onto railroad cars for shipment. Building Number 5 operates three shifts a day, seven days a week, with one crane operator and approximately 35 employees per shift. It contains an electric overhead crane which rides on rails mounted 30 feet above the floor, 115 feet apart from each other, and which extend the length of the building. The bridge of the crane spans the 115-foot width and rests on wheels which roll along the rails. The crane can lift loads weighing up to 7½ tons. Loads of pipe are either tied to, or cradled in,[4] the crane's hoist mechanism by employees known as "hookers" who work on the production floor.

On September 19, 1977, Edmond Semancik was operating the crane in Building Number 5. Semancik had operated that crane on a regular basis for three years. He had never before refused to operate the crane for safety or any other reasons. On this particular morning Semancik observed that the crane was riding more roughly than usual. The crane was bumping and sliding along the rails, causing the loads of pipe to rock and sway. Semancik stopped the crane to investigate and discovered a hole in the tread face of one of the wheels. The hole measured approximately 3½ inches long, 2½ inches wide, and ½ inch deep. Semancik had never seen such a hole in a crane wheel.[5] He testified that when the hole met a joint in the rail it caused the

---

filed by the Company on February 19, 1980, seeking to vacate the Board's order or, in the alternative, to remand for a clarification of the Board's deferral practices.

3. "Section 14(C). DISPUTES
An employee or group of employees who believe that they are being required to work under conditions which are unsafe or unhealthy beyond the normal hazard inherent in the operation in question shall have the right to:
1. File a grievance on the Second Step of the complaint and grievance procedure for preferred handling in such procedure and arbitration; and/or
2. Relief from the job or jobs, without loss to their right to return to such job or jobs, and, at Management's discretion, assignment to such other employment as may be available in the plant; provided, however, that no employee, other than communicating the facts relating to the safety of the job, shall take any steps to prevent another employee from working on the job, provided he first reports the matter to his committeeman or foreman. Should either the Management or the Arbitrator conclude that an unsafe condition within the meaning of this Section exist-

ed and should the Employee not have been assigned to other available, equal or higher-rated work, he shall be paid for the earnings he otherwise would have received.
It is recognized that emergency circumstances may exist and the local parties are authorized to make mutually satisfactory arrangements for immediate arbitration to handle such situations in an expeditious manner."

4. Some loads of pipe are tied, that is, bound, to the hooks of the crane with tightly wrapped cables; others are cradled: lifted in two loops of cable which have not been tightened around the load.

5. Unbeknownst to Semancik, this hole or "spall" had first been discovered in a routine inspection in May 1977. The affected wheel was removed two weeks later and replaced with a new, carbonized wheel. On July 31, 1977, the axle on the newly installed wheel broke. The previously removed wheel, which had been kept as a spare, was reinstalled. It, in turn, was replaced with another new wheel on October 9, 1977. See App. at 453a.

crane to slide suddenly, which in turn caused the load of pipes to sway. Semancik reported this to the production foreman and asked him to call the crane repairman. When the repairman arrived, Semancik showed him the wheel. When the repairman asked if Semancik wished to have the wheel changed, Semancik answered in the affirmative. The repairman left to get the equipment necessary to change the wheel and to report to his supervisor, Charles Michaels, the general foreman of shop services. The repairman returned and informed Semancik that Michaels had decided not to halt production and change the wheel. Semancik said that Michaels must not have understood the situation and, accompanied by the two employees who were working as "hookers" on that shift, walked to Michaels' office. Michaels told Semancik that the wheel was not going to be changed and ordered Semancik to run the crane or to go home. Semancik stated that he was invoking his right under § 14(C) of the collective bargaining agreement to be relieved of an unsafe job.

Semancik returned to the crane where he met the crane repairman and the crane repair foreman. Semancik operated the crane while they stood on the bridge observing the wheel. The repair foreman declared that the rails appeared to be slippery and needed sanding, but that the wheel was safe. During the sanding process one of the foremen noticed that the crane was out of alignment, "which could cause bumping, thumping and other noises." App. at 446a. He proceeded to realign the crane. After the wheels were sanded and the crane realigned,[6] the foremen concluded that any previous rough operation of the crane had been remedied and asked Semancik to resume operating the crane. When Semancik said that he was invoking his § 14(C) rights, the production foreman told him he was suspended. Semancik telephoned the union president. Semancik then told the general foreman that he was relying on § 14(C) in refusing to operate the crane. The general foreman reiterated that Semancik was suspended and ordered a replacement crane operator. At that point the union president arrived and told Semancik that he had a right under § 14(C) to inform the replacement of the condition which he believed to be unsafe, but not to attempt to persuade the replacement to refuse to work. Semancik described the condition of the wheel to the first replacement, who inspected the wheel and then invoked his § 14(C) right not to work.[7] When the second replacement, Francis Roberts, arrived, Semancik again pointed out the hole, visible from the production floor, and stated that he had asked to be relieved from his job under § 14(C) because the crane was not operating properly. Roberts decided that he too would invoke his § 14(C) rights. Although the foreman told Roberts that management believed the crane was safe and urged him to operate the crane, Roberts insisted on his right under § 14(C) to refuse to work under unsafe conditions. Roberts was then suspended. Shortly thereafter, he and Semancik left the building and went home.

The union president left, stating that he was going to file a safety complaint with the Occupational Safety and Health Administration. The union grievance committeeman, who had arrived a short time earlier,

---

**6.** Carroll, the superintendent of electrical maintenance, observed the spalled wheel and the operation of the crane after it had been realigned. He concluded that (1) the spalled area did not come in contact with the rails, (2) there was no bumping or thumping, which can be caused by the crane's being out of alignment, as the crane rode back and forth on the rails, (3) the wheel was safe and did not need to be changed immediately, but that a change could be scheduled for the "normal downturn" which was due to take place the next weekend or so, and (4) meanwhile it was safe to operate the crane. The managers and supervisors conferred among themselves and unanimously reached the conclusion that the spalled wheel did not create an unsafe or dangerous condition in the operation of the crane. Also, they were of the opinion that Semancik and Roberts acted without a reasonable basis for their belief that the wheel was dangerous. See App. at 446a–447a.

**7.** This replacement was not suspended because he was a new employee who was not yet fully qualified to operate the crane. App. at 155a, 448a.

remained. When a third replacement crane operator reported, the committeeman informed him about the hole in the wheel and the suspension of Semancik and Roberts. The division superintendent assured him the crane was safe. This operator inspected the wheel and briefly operated the crane. He agreed to operate it at a slow speed on the condition that he not be held responsible if anything went wrong due to the hole in the wheel. He operated the crane without incident for the rest of the day.[8]

The general foreman telephoned Semancik and Roberts on the afternoon of September 19 and informed them that they had been suspended for five days, the longest period of suspension without a prior hearing permitted by the collective bargaining agreement. Disciplinary hearings for both employees were held on September 23. Semancik, represented by the union committeeman and the acting union president, contended that he had properly invoked his contractual right, had been unjustly suspended, and was entitled to reinstatement with back pay. The Company charged that no hazardous condition had existed on September 19, that Semancik had been unreasonable in not accepting management's opinion that the crane was safe, and that he had unjustifiably refused to work, causing a loss in the scheduled production. The hearing became heated. Semancik insisted he had not been unreasonable in refusing to operate the crane.

Roberts' hearing followed. The same union and management representatives were present. The same matters were discussed, but the verbal exchange was less heated.

After the hearings the management representatives conferred and decided to suspend Semancik and Roberts for an additional 30 days to punish them for being inflexible and unreasonable and refusing to concede that they had been wrong. See App. at 452a. The employees were notified of their extended suspensions. They returned to work on October 30, 1977. Shortly thereafter, Roberts told Michaels, the general foreman, that he and Semancik had not deserved 30-day suspensions. Michaels responded by saying that the additional discipline would not have been imposed if Semancik had "kept his mouth shut at the meeting". App. at 113a–114a.

## II.

In its petition for review, the Company argues that the dispute here concerned contract interpretation, rather than violations of the national labor laws. Consequently, it is the Company's position before this court that the Board should have refrained from acting and allowed the arbitration machinery to resolve the issues. The Board asserts that the contract issue was only incidental to the alleged unfair labor practice. Moreover, according to the Board, even when the resolution of a contract issue is more central to a case, the Board is not pre-empted by the overlapping domain of the arbitrator. In this the Board is correct. As the Supreme Court stated in *National Labor Relations Board v. Strong*, 393 U.S. 357, 360–61, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969):

"[I]n some circumstances the authority of the Board and the law of the contract are overlapping, concurrent regimes, neither pre-empting the other. Arbitrators and courts are still the principal sources of contract interpretation, but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract." (Citations and footnote omitted.)

*See National Labor Relations Board v. C & C Plywood Corporation*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *Mastro Plastics Corp. v. Labor Board*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

---

8. In fact, the wheel in dispute was not replaced until October 9, 1977 (see note 5, *supra*). The crane operated without incident in the interim.

Although not ousted from jurisdiction by the presence of contractual issues, the Board may choose to defer to the arbitration process. *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). In *Carey v. Westinghouse Electric Corporation*, 375 U.S. 261, 271–72, 84 S.Ct. 401, 408–09, 11 L.Ed.2d 320 (1964), where 29 U.S.C. §§ 158(b)(4)(D) and 160(k) were applicable, the Supreme Court noted with approval the Board's discretionary practice of deferral. *Cf. Smith v. Evening News Association*, 371 U.S. 195, 198 n. 6, 83 S.Ct. 267, 269 n. 6, 9 L.Ed.2d 246 (1962). The Board has exercised its discretion to defer not only when there is an outstanding arbitral award, *Spielberg Manufacturing Company*, 112 N.L.R.B. 1080, 1082 (1955),[9] but also in some circumstances when no award has yet been issued. *Collyer Insulated Wire*, 192 N.L.R.B. at 841–42.[10] The Board has indicated that the party seeking deferral must raise it before the administrative law judge, and must state the factors which make deferral appropriate for that particular case. *MacDonald Engineering Company*, 202 N.L.R.B. 748, 748 (1973); *see Montgomery Ward & Company*, 195 N.L.R.B. 725, 725 n. 1 (1972). This court in *Food Fair Stores, Inc. v. National Labor Relations Board*, 491 F.2d 388, 395–96 n. 9 (3d Cir. 1974), recognized the Board's practice of considering deferral only if raised as an affirmative defense. In approving this policy, the court highlighted two reasons justifying the requirement that deferral be raised as an affirmative defense:

"First, the failure to raise such a defense may indicate that neither party to the contract desires arbitration—a factor clearly mitigating against deferral. Second, the rule assures that the Board will have the opportunity of deciding whether to defer to arbitration after hearing all the facts relevant to the appropriateness of deferral in each particular situation."

*Id.* At oral argument, when queried as to whether it had requested deferral, the Company called attention to the written opening statement it introduced at the hearing before the administrative law judge (ALJ) and to the exceptions to the decision of the ALJ it raised before the Board. We have carefully reviewed the opening statement and find no request in it for deferral. Similarly, our examination of the 42 exceptions was fruitless. Indeed, the word "deferral" was not mentioned even once in the record, nor did the Company enumerate to the ALJ those facts it considered supportive of the appropriateness of deferral in this particular situation. Moreover, at the hearing the Company never even stated that there were ongoing arbitration proceedings; the ALJ raised this issue on his own. App. at 17a. Only in response to the ALJ's question did the Company answer that a grievance had been filed and that it was "expected in due course that it would go to arbitration." App. at 18a. The Company, however, never

9. In *Spielberg Manufacturing Company*, 112 N.L.R.B. 1080 (1955), the Board refrained from exercising jurisdiction and deferred to an arbitrator's decision on the merits. The Board summarized its policy of deferring in cases where an arbitrator's award is present if "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the [National Labor Relations] Act." *Id.* at 1082.

10. In *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971), the Board deferred to arbitration proceedings which had not been completed at the time of the unfair labor practice hearing. The Board identified three factors which supported the exercise of its discretion to defer: (1) a long-standing bargaining relationship with clearly defined and tested grievance-arbitration procedures; (2) the absence of evidence of anti-union animus; and (3) a dispute which is well suited to resolution by arbitration.

In 1977 a change, attributable to a change in the membership of the Board, in this policy developed. In *General American Transportation Corporation*, 228 N.L.R.B. 808 (1977), the Board, in a split vote, announced the following policy: although the Board has the authority to defer to ongoing arbitration proceedings, the Board will not exercise its discretion to defer in instances where §§ 8(a)(1) and 8(a)(3) have allegedly been violated. Since that time the Board has not deferred in § 8(a)(1) and § 8(a)(3) cases.

There is no need to address the merits of the doctrines in the cases cited in notes 9 and 10 of this opinion on the record in this case.

hinted that it was raising the affirmative defense of deferral.[11] It certainly never pressed the issue before the ALJ and the Board. Because we find the record barren of any explicit request for deferral in this case, we cannot say the Board in this case abused its discretion by proceeding to consider the unfair labor practices charge.

### III.

 If the Board's decision is supported by "substantial evidence on the record as a whole," we are bound to enforce its order. *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Company v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *see Tri-State Truck Service, Inc. v. National Labor Relations Board*, 615 F.2d 65 (3d Cir. 1980). Turning

first to the suspensions of Semancik and Roberts, we hold that the Board's conclusion that these incidents constituted an unfair labor practice in violation of § 8(a)(1) of the Act is supported by substantial evidence on the record as a whole.

Section 7 of the Act, 29 U.S.C. § 157, provides in pertinent part:

"Employees shall have the right to . . . engage in other concerted activities for the purpose of . . . mutual aid or protection . . ."

Section 8(a)(1) provides:

"It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title[.]"

 The Company admits that it suspended Semancik and Roberts for refusing to operate the crane in Building Number 5. The Company denies, however, that these suspensions constitute an unfair labor practice. It asserts that these employees were

---

11. Although in its petition for review the Company does not claim that remarks made at the hearing constitute a request for deferral, we note that the matter of arbitration was discussed. We believe that a fair reading of that discussion leads to the conclusion that the Company was urging the ALJ to consider the pertinent arbitral law in reaching his decision on the unfair labor practice charge, rather than requesting deferral. Implicit in the plea to the ALJ to give weight to the interpretations of past arbitrators is the idea that the ALJ will be deciding the case, not deferring. The pertinent passage follows:

"MR. DOTSON; We will elaborate on this later, but I would like at this point to invite the Court's attention to the fact that there is a substantial body of arbitual law which is the common law of our agreement sustaining the corporation's position in awarding discipline under facts, identical and similar to those involved in this case.

"But I think it's important for the Court to understand from the out-set that the provision we are dealing with in the contract is identical to that found in the basic Labor agreements of the basic steel industry.

"It has been arbitrated many times and the Court must look at the consistent interpretations that have been placed on that provision to have a proper understanding of the case.

"You simply can't take, as I am sure Your Honor knows, the bare language of an agree-

ment and have an accurate understanding of how it has been implemented and how it will be implemented.

"JUDGE BISGYER: Has this matter gone to arbitration?

"MR. DOTSON: A grievance has been filed and it is expected in due course that it will go to arbitration.

"We have a typical grievance arbitration procedure final and binding in cases of contract interpretation as well as discipline. We have a permanent umpire and the system has worked well for many years.

"MR. ELAM: Well, Your Honor, we would take the position that whether or not the employees' claim was found to be meritorious under the contract, the employee still has the right to raise issues under the contract which he believes to be covered by the contract and is engaging in protected activities, even should his claim turn out to be non-meritorious.

"JUDGE BISGYER: Well, let's proceed. There hasn't been an award, and if there were an award, and the General Counsel had claimed that the award was repugnant to the rights accorded parties under the Act, we'd go through the procedure to determine what the facts are, and to determine whether the award coincides with the law."

App. at 17a–18a.

not exercising rights protected by § 7 when they were suspended. The Company characterizes Semancik's and Roberts' refusals to operate the crane as individual acts, not concerted activity. However, we cannot say that the Board's conclusion in this regard is erroneous.

The record reveals that this incident involved more than individual refusals by Semancik and Roberts. When Semancik invoked his rights under § 14(C) of the collective bargaining agreement, he declared that the safety of the employees working on the floor below was endangered, as well as his own. App. at 456a. When he went to discuss the condition of the wheel with Michaels, the electric shop foreman, two other employees working with the crane accompanied him. App. at 443a.[12] Roberts spoke to Semancik about the possible hazard before he decided to refuse to operate the crane. Thus, from the beginning there was some group action by fellow workers in the interest of employee safety. Further, the union was also involved. Semancik contacted his union representatives before he left the building on the morning of September 19, 1977. At his request, the union president and union grievance committeeman came to the site of the incident. App. at 448a–449a. The union represented Semancik and Roberts at their hearings on September 23. Additionally, the union president filed a complaint with the Occupational Safety and Health Administration concerning the potential danger the wheel created for all the employees.[13] On this record it would be fair to say that Semancik and Roberts acted here as spokesmen for the safety of all the employees, and that the employees—as indicated by the union's actions—shared this safety concern.

Support for this analysis is provided by *Mushroom Transportation Company v. National Labor Relations Board*, 330 F.2d 683 (3d Cir. 1964). There the court recognized that, while mere griping by an employee about his individual concerns is not protected under § 7, some statements by individuals do rise to the level of concerted activity. The court emphasized:

"It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it *had some relation to group action in the interest of the employees.*

\* \* \* \* \* \*

"Activity which consists of mere talk must, in order to be protected, be talk looking toward group action. If its only purpose is to advise an individual as to what he could or should do *without involving fellow workers or union representation* to protect or improve his own status or working position, it is an individual, not a concerted, activity, and, if it looks forward to no action at all, it is more than likely to be mere 'griping.' "

*Id.* at 685 (emphasis supplied). In light of the fact that both the action of fellow workers and union representation were present in this case, we conclude that there is substantial evidence to support the Board's finding of concerted activity within the meaning of § 7 of the Act.[14]

---

12. These were "hookers," see p. 1012, *supra,* employees whose safety would likely be most endangered if the pipes suspended from the crane slipped or swung haphazardly.

13. On September 19, the date Semancik discovered the hole in the wheel, the union president telephoned the Occupational Safety and Health Administration (OSHA) to report the hazardous condition of the wheel. Semancik and Roberts responded to OSHA's request for more information. An OSHA representative visited the plant two days later and inspected the wheel. OSHA issued a citation requiring the

Company to remedy the situation by November 7, 1977. The wheel was, in fact, removed on October 9. Apparently, OSHA scheduled a hearing on the citation, but the citation was withdrawn and a hearing never took place. See App. at 453a.

14. Our decision in *National Labor Relations Board v. Northern Metal Company*, 440 F.2d 881 (3d Cir. 1971), is not applicable to this record. Because there is ample evidence in the record to support the finding that the refusals to operate the crane were not solitary acts by individual employees, we need not reach the

**1018**

Similarly, there is evidence in the record to support the finding that the actions of Semancik and Roberts were not only concerted, as opposed to individual, but also undertaken for mutual aid or protection. Indeed, the very evidence discussed above supports this finding. It was the concern for the safety of the other employees, as well as themselves, that motivated Semancik and Roberts.

█ Although concerted action for mutual aid or protection is generally protected under § 7 of the Act, there are certain types of concerted activity which fall outside the shelter of § 7. Activities which are unlawful, violent, or in breach of contract are unprotected. *National Labor Relations Board v. Washington Aluminum Company,* 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962). *See National Labor Relations Board v. Sands Manufacturing Company,* 306 U.S. 332, 345, 59 S.Ct. 508, 515, 83 L.Ed. 682 (1939). The Company urges that the actions of Semancik and Roberts violated the collective bargaining agreement and thus are unprotected. Specifically, the Company argues that the refusals of Semancik and Roberts to operate the crane were not in good faith within the meaning of § 14(C) of the collective bargaining agreement. Therefore, according to the Company, they were properly subject to discipline. The Company contends that the ALJ erred in declining to use the good faith test fashioned by some arbitrators in interpreting clauses similar to § 14(C). The Company insists that both prongs of this test must be met: (1) sincere belief, and (2) reasonable basis in fact.

The ALJ noted that the disputed clause pertains to "employees who believe they are being required to work under conditions which are unsafe or unhealthy beyond the

normal hazard inherent in the operation in question". He distinguished the arbitration cases defining good faith which the Company presented, and stated that he believed that the good faith component of § 14(C) required only that the employee have a sincere belief that an abnormally hazardous condition existed and that he not invoke the clause as a pretext. App. at 454a–455a. The ALJ also went further and made specific findings that the actions of Semancik and Roberts were both sincere and reasonable.[15]

Our review of the record indicates that there is substantial evidence to support these findings. It is undisputed that Semancik was an experienced crane operator. The production foreman testified that Semancik was one of the best cranemen he had ever supervised. App. at 213a. He had never before refused to work for safety reasons or any other reasons. On the morning of September 19, he experienced difficulty in operating the crane smoothly. Upon inspection, he discovered a hole in the tread face of one of the wheels of the crane. He had never before seen such a hole on a crane wheel. He immediately reported it to his supervisor, indicated his concern for the safety of himself and others, and requested that the wheel be changed. The Company argues that Semancik was unreasonable because he continued to believe that the wheel constituted a hazard in the face of the contrary opinions voiced by Company officials. A number of supervisors did attest to the safety of the crane at the time of the incident; not all of them were knowledgeable about electrical crane maintenance, however. See, *e. g.,* App. at 194a, 216a, 218a. Although at least two were qualified in this field (Board's brief at 32–33 n. 25), we believe that there is substantial evidence

issue of constructive concerted activity. We note that this court in *Northern Metal, supra* at 884, declined to follow the constructive concerted activity doctrine enunciated in *National Labor Relations Board v. Interboro Contractors, Inc.,* 388 F.2d 495 (2d Cir. 1967).

**15.** We note that in *National Labor Relations Board v. Modern Carpet Industries, Inc.,* 611 F.2d 811 (10th Cir. 1979), the Tenth Circuit

apparently adopted the NLRB's position that a good faith belief that working conditions are abnormally hazardous need not be reasonable so long as it is sincere. We do not address this issue because, as explained in the text at page 1018 below, there is evidence in this case to support the ALJ's findings that the employees' actions were reasonable as well as sincere.

to support the ALJ's finding that, in light of Semancik's experience and skill, the crane operators' refusals to work for safety reasons on September 19 had a reasonable basis in fact and did not constitute a breach of contract.[16]

Accordingly, the Board's conclusion that the conduct of Semancik and Roberts on September 19, 1977, was protected by § 7 of the Act, and that the Company therefore violated § 8(a)(1) of the Act by disciplining them for that conduct, is supported by substantial evidence on the record as a whole.

IV.

The Board upheld the ALJ's conclusion that the suspensions of Semancik and Roberts also constituted an unfair labor practice in violation of § 8(a)(3) of the Act. This section provides:

"It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

■ A violation of this section is based upon the existence of both discrimination and a resulting discouragement of union membership. Generally, a finding of anti-union purpose must also be present. *American Ship Building Company v. National Labor Relations Board*, 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965). The Supreme Court has explained the significance of the employer's motive in § 8(a)(3) cases.

"It has long been established that a finding of violation under this section will normally turn on the employer's motivation. Thus when the employer discharges a union leader who has broken shop rules, the problem posed is to determine whether the employer has acted purely in disinterested defense of shop discipline or has sought to damage employee organization.

It is likely that the discharge will naturally tend to discourage union membership in both cases, because of the loss of union leadership and the employees' suspicion of the employer's true intention. But we have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. Such a construction of § 8(a)(3) is essential if due protection is to be accorded the employer's right to manage his enterprise."

*Id.* (citations omitted). There is some conduct, however, which is so "inherently destructive of employee interests" that proof of improper motive is not necessary. *National Labor Relations Board v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967).

■ In this case, the decision of the ALJ, adopted without modification by the Board, focused on the § 8(a)(1) claim. Indeed, the § 8(a)(3) claim was only discussed in a portion of one sentence. Without any factual basis, the ALJ simply maintained:

"[The employer's action in disciplining Semancik and Roberts] constitutes, as well, discrimination which discourages employees from relying on the fruits of a collective bargaining contract secured for them by their collective bargaining agent in violation of Section 8(a)(3)."

App. at 454a. No attempt was made to document this assertion or to analyze the situation to determine whether it was likely that discouragement of union membership would result. Moreover, a careful examination of the record reveals that the evidence of anti-union animus is non-existent. In face of the lack of factual underpinnings for the ALJ's assertion, the absence of anti-union purpose, and the absence of any contention that the suspensions at issue are so

---

16. The Company asserts that the uneven functioning of the crane on September 19 was due not to the hole in the wheel but to misalignment of the crane. We conclude, however, that on this record there is substantial evidence to support the ALJ's finding that Semancik and Roberts were entitled to act on their belief that a dangerous condition continued to exist after the realignment.

"inherently destructive of employee interests" that improper motive is irrelevant, we cannot say that this barren record supports a finding that the Company violated § 8(a)(3). Accordingly, we hold that the Board's conclusion that the Company violated § 8(a)(3) is not supported by substantial evidence on the record as a whole.

## V.

 Lastly, the Board concluded that a remark made by Michaels, the general foreman, constituted an unfair labor practice in violation of § 8(a)(1). As noted above, this section of the Act protects employees in the exercise of their § 7 rights (see discussion at p. 1016). The ALJ made a specific factual finding that after the two employees returned to work from their suspension Roberts remarked to Michaels that they had not deserved the 30-day suspensions. Michaels answered that the lengthy suspension would not have been imposed if Semancik had "kept his mouth shut" at the hearing. App. at 453a. The ALJ concluded that this remark by Michaels "interfered with, restrained and coerced employees in the exercise of their Section 7 rights to protected union and other concerted activities" [in that] "such a statement might well serve as a warning that adherence to and a vigorous defense of employees' invocation of rights under a collective bargaining agreement would lead to more severe disciplinary action than would otherwise be imposed." App. at 458a.

To establish a § 8(a)(1) violation, it must be shown that, in light of all the existing circumstances, the employer's conduct may "reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *National Labor Relations Board v. Armcor Industries, Inc.,* 535 F.2d 239, 242 (3d Cir. 1976). *See Local 542, International Union of Operating Engineers v. National Labor Relations Board,* 328 F.2d 850, 852–53 (3d Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). The fact-finder must determine whether a threat, either latent or overt, is contained in the employer's words. *National Labor Relations Board v. Triangle Publications, Inc.,*

500 F.2d 597, 599 (3d Cir. 1974); *Mon River Towing, Inc. v. National Labor Relations Board,* 421 F.2d 1, 9–10 (3d Cir. 1969). As with other findings, the appellate court must review the Board's determination to ensure that it is reasonable and supported by substantial evidence. *Id.*

Judged by these standards, we find unreasonable the ALJ's determination that coercion and threat of reprisal were implicit in the comment made by Michaels. It is undisputed that Michaels did not initiate the conversation, but rather, only responded to a comment made by Roberts. Apparently the whole exchange totalled only two sentences. There is no evidence in the record to indicate that this remark was made in a hostile or vindictive tone. As stated earlier (see pp. 1018–1019, *supra*), there is no evidence of anti-union animus on the part of the employer. Further, it is undisputed that Semancik had responded heatedly at his disciplinary hearing. The remark by Michaels thus was not an inappropriate comment on the tenor of the hearing. In sum, the record reveals that Michaels made a single, isolated, non-hostile, comment in response to a remark by Roberts. A review of the record as a whole compels us to conclude that the finding by the ALJ that this remark reasonably tended to coerce or intimidate employees is not supported by substantial evidence. Therefore, we conclude that the Board erred in deciding that this incident constituted an unfair labor practice in violation of § 8(a)(1).

## VI.

In conclusion, we hold that under the circumstances of this case the Board did not abuse its discretion in not deferring to a pending, uncompleted arbitration proceeding. We further hold that on the record considered as a whole there is substantial evidence that the Company committed an unfair labor practice, in violation of § 8(a)(1), when it suspended Semancik and Roberts. We believe, however, that substantial evidence does not exist to support the conclusion that the Company violated § 8(a)(3) by suspending these two employees. Nor is there substantial evidence that the remark by general foreman Michaels

constituted an unfair labor practice in violation of § 8(a)(1). Accordingly, insofar as the Board's order relates to the suspension of Semancik and Roberts in violation of § 8(a)(1), we will enforce the Board's order and deny the Company's petition for review.[17] Insofar as the Board's order relates to the remark made by Michaels, we will deny enforcement of the Board's order and grant the Company's petition.

For the foregoing reasons, the order of the Board shall be modified by deleting (1) paragraph 1(b) of the order of the Board, and (2) the second paragraph of the Notice to Employees,[18] and, as so modified, the order will be enforced.

17. As the Board concluded on alternative grounds (§ 8(a)(1) and § 8(a)(3)) that the suspensions were unlawful, and we have upheld the Board on one of its theories (§ 8(a)(1)), the relief granted to remedy the suspensions must be afforded to the employees.

18. Paragraph 1(b) of the order states that the Company shall cease and desist from

"[w]arning employees that adherence to, and a vigorous defense of their invocation of rights under a collective-bargaining agreement would lead to more severe disciplinary action than would otherwise be imposed."
App. at 460a.

The second paragraph of the notice ordered by the Board states:

"WE WILL NOT warn or threaten employees that adherence to, or a vigorous defense of their invocation of their rights under a collective bargaining agreement would lead to more severe disciplinary action than would otherwise be imposed."
App. at 437a.

Of course, the Company may not lawfully threaten employees with more severe disciplinary action than otherwise would be imposed if they invoke their rights under the collective bargaining agreement. The presence of these paragraphs in the order and notice, however, implies that the Company has made such unlawful threats. Since we have found that coercive remarks did not occur here, we conclude that this implication is improper and that these paragraphs should be excised.