**HERMAN BROTHERS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–2488.

United States Court of Appeals, Third Circuit.

Argued July 13, 1981.

Decided Sept. 3, 1981.

Rehearing Denied Dec. 11, 1981.

Walter H. Flamm, Jr. (argued), Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., D. Richard Powell, Jr., Cunniff, Bray & McAleese, Bala-Cynwyd, Pa., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, W. Christian Schumann, Ann Jones Diamond (argued) N.L.R.B., Washington, D. C., for respondent.

Before SEITZ, Chief Judge, and VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT
VAN DUSEN, Senior Circuit Judge.

Herman Brothers, Inc. (the "Company") petitions this court to review and set aside an order issued by the National Labor Relations Board ("Board"). The Board seeks enforcement of its order. The Company contends that (1) the Board erred in refusing to defer to the arbitration procedure established in the collective bargaining

agreement, and (2) the Company did not violate § 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) and (3). After careful consideration, we have decided to deny the Company's petition and grant the Board's application for enforcement.

## FACTS [1]

The Company engages in the interstate transportation of freight and other commodities. It employs truck drivers represented by the General Drivers, Warehousemen, and Helpers Local Union No. 21, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Union"). Stief, the complainant in this case, works for the Company as a truck driver and is a Union member.

At the time this dispute arose, the Union and the Company were operating under an extension of their expired collective bargaining agreement. A new collective bargaining agreement had been negotiated but not yet ratified. The Union submitted this proposed contract to its membership for approval. Mail ballots were distributed and due to be counted in Hannibal, Mo., on October 5, 1979.

A dissident faction within the Union, including Stief, opposed ratification. This faction's opposition focused on the so-called mileage payment provision. This provision altered the manner of computing the drivers' wages: instead of using an hourly rate, the proposed agreement required using a mileage rate.

On September 26, 1979,[2] Stief wrote and distributed a letter to his fellow drivers in which he criticized the mileage payment provision. The Company acknowledges that its management learned Stief had written the letter and was irritated by it.

On October 3, Stief asked Dispatch Supervisor Hansen if he could take October 5 off to attend to personal business in Bowling Green, Mo. Hansen granted his permission.

Normally, Stief received his job assignments from Dispatch Supervisor Hansen. Hansen would call Stief either the evening before, or the morning of, the day the job had to be done. Jobs were assigned according to seniority. Following this standard dispatch procedure, Hansen called Stief early on October 4 to give him his day's work assignment. Stief's wife told Hansen that Stief was ill and could not work.

Hansen called again that evening to give Stief his job assignment for October 5. Mrs. Stief answered the call and reminded Hansen that he had given Stief October 5 off. Because Hansen had heard that, instead of attending to personal business, Stief was going to watch the ballots being counted, he told Mrs. Stief that if Stief went to watch the ballot count, the Company would issue a warning letter for excessive absenteeism. Hansen repeated this statement to Stief and, in a later telephone conversation, told Stief he would be in a lot of trouble if he went to the union hall in Hannibal.

Stief did not watch the ballot count on October 5. He did attend to his personal business and also went to St. Louis where he discussed several problems with a Union business representative.

Because October 5 was a Friday, the next work day was October 8. Stief did not receive a call to work on October 8 or on any day thereafter. He did receive, however, a call from Union Steward Hubbard. The Company had asked Hubbard to call Stief and tell him that, due to his October 4 and 5 absences, he was obliged to call in his availability to work. Hubbard called Stief and relayed this message on October 6 and again on October 8.[3] Both calls were made

---

1. These facts reflect the findings of the ALJ (A. 401–411) and are not contested here by the Company.

2. Unless otherwise noted, all dates refer to 1979.

3. The findings of the ALJ include this wording (A. 406–07):

"The Respondent took the position that Stief did not have permission to be away from work on Friday, October 5, and that under all the circumstances, including his unavailability due to illness on October 4, was

at the Company's request. Stief refused to call in his availability because "the Company was obliged to call him" (A. 406).

In a letter dated October 11, the Company notified Stief of his discharge. According to the letter, Stief had voluntarily quit pursuant to Work Rule 6(a). Work Rule 6(a) provides: "Absent for 3 consecutive working days without notification. Voluntary Quit."

## PROCEDURAL HISTORY

The procedural history of this case is complicated by the presence of two arbitration proceedings, both of which concern Stief's discharge. The chronology of events is particularly noteworthy.

Stief filed a grievance on October 11, 1979. On October 25, 1979, the arbitration committee,[4] consisting of three union and three management representatives, considered Stief's grievance and held he had been discharged for cause. All now agree that certain remarks made by the Company representative rendered this first arbitration proceeding unfair.

In early November, Stief filed unfair labor practice charges against both the Union and the Company. He charged the Union with unfairly representing him at the arbi-

---

obliged to call in his availability for work before being dispatched. Consequently, on October 6, when Werbach and Hansen made up and issued the dispatches for Monday, October 8, Stief was bypassed. In addition, Werbach, who customarily contacted Union Steward Kenneth Hubbard when a potential employee problem arose, asked Hubbard to call Stief and make sure he understood the company policy about making himself available for work. Hubbard agreed. However, before Hubbard reached Stief, Stief called Hubbard around 1 p. m. that day and complained about not having been dispatched. Maureen Stief testified that she secretly listened to the conversation on another phone. Hubbard advised Stief to call the Respondent and make known his availability for work, but Stief insisted he had been bypassed and that the Company was obliged to call him. Stief accused Hubbard of failing to properly represent the Union's members, favoring the Company, engaging in improper conduct by hitting a union member in the mouth, and demanded Hubbard's resignation. Hubbard hung up the phone.[7] A few minutes later Hubbard called Stief in an effort to placate him. Hubbard explained that he did not want to see Stief create a situation which might result in his suspension, discharge, or a voluntary quit. According to Hubbard, Stief responded that he didn't mean what he'd said about Hubbard resigning, and that Hubbard had done a good job and Stief hoped he would stay on. In his testimony, Stief agreed that Hubbard apologized, but insisted that the apology was for threatening Stief. Stief also claimed Hubbard stated that the pressures of being a shop steward were too much for him, and that he would resign in January. Hubbard's telephone bill shows that he made a call to Stief's telephone number at 2:44 p. m. on October 6, and talked for 41 minutes. I find the timing and the length of the call more consistent with the concilia-tory tone of Hubbard's version, which is credited.

"On Monday, October 8, Stief remained at home.... At 4:09 p. m. that afternoon, in response to a second request from Werbach, Hubbard again telephoned Stief and talked with him for 8 minutes about contacting the Company with respect to making known his availability for work. Stief adhered to his original position that he had been wrongfully bypassed by the Company, that the Respondent was obliged to call him for dispatch, and that if he lost his job he would file a grievance and, if necessary, take the matter up with the Labor Board.[8]

"[7] Fred and Maureen Stief also testified that Hubbard ended the conversation with the remark that the Union and the Company were tired of Stief's s___, and were going to get rid of him. Stief also insisted that Hubbard made no mention of the contention that Stief was obliged to report himself available for work on October 5 in order to be eligible for dispatch. Hubbard denied making the threat, and insisted that he relayed the Respondent's position with respect to Stief's availability. I credit Hubbard over Stief in this respect. In all other respects the above version of this telephone conversation is an amalgam of their credited testimonies. In any event the alleged remark is hearsay with respect to the Respondent's intentions, as is the subsequent alleged threat by Hubbard, concerning Stief, to driver-steward Frank Warren.

"[8] As indicated by Hubbard's telephone bill, Fred and Maureen Stief's testimony that they received no phone call from Hubbard on October 8 is clearly in error. Hubbard is credited with respect to this conversation."

4. In the record, this is called a grievance committee.

tration proceeding and charged the Company with violating § 8(a)(1) and (3). The charges against the Company are the subject matter of this petition.

A hearing before an administrative law judge ("ALJ") on all charges was scheduled for January 15, 1980. Immediately prior to the start of the hearing, the Union and Stief settled their differences. Pursuant to their settlement agreement, the Union promised to seek a second arbitration concerning Stief's discharge. The Company was told of this arrangement and indicated it would not object to a second proceeding. The ALJ then received testimony on Stief's charges against the Company.

On February 1, 1980, Stief's grievance was resubmitted to a different arbitration committee. This committee, like that of October 25, consisted of three union and three management representatives. The committee held:

> "Based on the facts presented, the grievant [Stief] was justly discharged for bein [sic] unavailable for work for more than three days without notice and without making himself available for work. Although the grievant engaged in activity in opposition to the mileage contract, this activity played no part in the decision to discharge."

On February 21, 1980, the Company submitted its brief regarding Stief's unfair labor practice charge to the ALJ. Although the record had closed, the Company also submitted, attached to its brief, a copy of the second, February 1, 1980, arbitration award and requested that the ALJ defer to this second award.

The ALJ rendered his decision in July 1980. He determined that: (1) the Company violated § 8(a)(1) when its Dispatch Supervisor Hansen threatened Stief with dis-

ciplinary action if Stief went to watch the ballot count; and (2) the Company violated § 8(a)(1) and (3) when it discharged Stief in retaliation for his protected union activities.[5] The ALJ never mentioned or considered deferring to the second arbitration award issued on February 1, 1980.

The Company moved to reopen the record to admit the second arbitration decision. The Board denied the motion and refused to even consider whether or not to defer to the second award. The Board affirmed the conclusions of the ALJ.

The Company seeks review of: (1) the Board's decision not to even consider deferring to the second arbitration proceeding (deferral issue), and (2) the Board's conclusion that the Company violated § 8(a)(1) and (3) when it discharged Stief. The Company does not dispute that Hansen's threat to discipline Stief if he went to watch the ballot count constitutes a violation of § 8(a)(1).[6]

## THE DEFERRAL ISSUE

The Company argues that the Board should have refused to assert its jurisdiction and, instead, deferred to the second arbitration award. The Board, in addressing the Company's deferral request, reached alternative holdings.[7] The Board first held that it did not have to even consider deferring to the second arbitration award because the award was not issued or brought to the ALJ's attention until after the hearing when the record was closed. Alternatively, the Board held that, under the facts of this case, it would refuse to defer. The Company challenges both holdings.

We first address the Board's determination that it need not even consider deferring to an arbitration award issued after the record is closed. Pursuant to a long-

---

**5.** The ALJ also refused to defer to the first arbitration award rendered on October 25, 1979. The Company does not contest this determination.

**6.** Although the Company seeks review of the Board's decision generally, see "Petition for Review" at A. 433, it did not discuss in its brief or at oral argument the Board's conclusion that

Hansen's threat to discipline Stief constitutes a violation of § 8(a)(1). Therefore, we do not address this conclusion.

**7.** The Board also denied the Company's motion to reopen the record. In light of our approval of the Board's refusal to defer, this denial was appropriate.

standing, discretionary policy, the Board has chosen, in certain situations, to relinquish its jurisdiction and defer to the arbitral procedure established in the parties' collective bargaining agreement. *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955); *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). This discretionary deferral policy has been noted with approval by the Supreme Court. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 270–71, 84 S.Ct. 401, 408–409, 11 L.Ed.2d 320 (1964).

■ The Board will consider deferring to arbitration only if the party seeking deferral raises it before the ALJ and states the factors that make deferral appropriate in that particular case. *MacDonald Engineering Co.*, 202 N.L.R.B. 748 (1973), cited with approval in *Wheeling-Pittsburgh Steel v. N.L.R.B.*, 618 F.2d 1009, 1015 (3d Cir. 1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981). The issue presented here is whether the Company's request for deferral, made after the hearing and the closing of the record, but before the ALJ issued his decision, satisfies the notice requirement set out in *MacDonald Engineering Co.* and approved in *Wheeling-Pittsburgh Steel*.

■ Normally, the party seeking deferral must make its request at the first opportunity. As the Board points out, the Company did not notify the ALJ that it sought deferral at the hearing of January 15–16, 1980. Rather, the Company waited until February 21, 1980, at which time the record had closed and the Company knew of the arbitration committee's favorable decision. The Company's failure to request deferral at the hearing or before the record closed, however, is understandable. Generally, a dispute only goes through arbitration once. Although the Company knew the Union had agreed to seek a second arbitration, it did not know when, if ever, such arbitration

would occur.[8] Furthermore, had the Company requested the ALJ to defer to the second, pending arbitration proceeding, its request would have been denied. The Board has not in the past deferred to pending arbitration where § 8(a)(1) and (3) has allegedly been violated. *General American Transportation Corp.*, 228 N.L.R.B. 808 (1977). Because the Company was charged with violating § 8(a)(1) and (3), any request for deferral at the time of the hearing would have been futile. Under these circumstances, the Company logically waited until the arbitration occurred and an award issued before it asked the ALJ to defer.

The Company did notify the ALJ of the second arbitration award at the first reasonable opportunity. The Company attached a copy of the second arbitration award to its brief which it submitted to the ALJ on February 21, 1980, just 20 days after the arbitration award was rendered. There was no reason to notify the ALJ any earlier as the ALJ could not be expected to take any action in the case until the briefs were filed.

■ Because the Company requested deferral before the ALJ issued his decision, the ALJ was given the time and opportunity to consider deferral. Consideration of the deferral issue, in many cases including this one, will not delay resolution of the dispute because the issue can be resolved without reopening the record. If the party seeking deferral (here the Company) fails to present factors supporting deferral, the ALJ, like the Board, may properly refuse to defer.[9] *Wheeling-Pittsburgh Steel, supra* at 1015. Requiring the ALJ and Board to at least consider the deferral request also promotes the Board's deferral policy, a policy the Board voluntarily adopted. Once the policy is adopted, it should be consistently applied. *Memorial Hospital of Roxborough*

---

8. Even though the ALJ may have known of the likelihood of a second arbitration proceeding since it was included in the settlement agreement submitted to the Board, the Company did not present to the ALJ factors justifying deferral as contemplated by *Wheeling-Pittsburgh Steel v. N.L.R.B., supra* at 1015.

9. In other cases where the request to defer appears meritorious, the Board may have to reopen the record and permit the opposing party to submit evidence against deferral. This may delay resolution of the dispute.

v. *N.L.R.B.*, 545 F.2d 351 (3d Cir. 1976); *N.L.R.B. v. Silver Bay L.U. No. 962, Int. Bro. of P., S. & P.M.W.*, 498 F.2d 26 (9th Cir. 1974).

We hold that, under the particular circumstances in this case, the Company's request for deferral, made before the ALJ rendered his decision, satisfies the notice requirement established in *MacDonald Engineering Co., supra*, and approved in *Wheeling-Pittsburgh Steel, supra.* Therefore, the ALJ and the Board should have considered whether or not to defer to the second arbitration award.

Because we hold that the Board should have considered whether or not to defer, we must review the Board's alternative determination that, if it had to consider deferring, it would refuse to defer. In *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955), the Board determined it would defer to an arbitrator's decision if "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the [National Labor Relations] Act." After applying *Spielberg* to the facts of this case, Members Jenkins and Penello both concluded, although *for different reasons*, not to defer because the second arbitration proceeding did not appear to be fair.

■■■ The Board's decision that the arbitration proceeding appeared to be unfair can be reversed only if the Board abused its discretion. *Hammermill Paper Company v. N.L.R.B.*, 658 F.2d 155 (3d Cir. No. 80–

2499, Aug. 26, 1981). We hold the Board did not abuse its discretion and agree with the rationale presented by Member Penello as to why the second proceeding appears to have been unfair.[10] The arbitration panel consisted only of union and management representatives, both of whose interests appeared to be aligned against Stief. Normally, the Union representatives would adequately represent Stief's interest. Here, however, Stief actively opposed adoption of the proposed collective bargaining agreement which was supported by the Union as well as the Company. Stief had had several disagreements with the Union leadership[11] which further aggravated the relationship between Stief and the Union. Given these facts, the Board did not abuse its discretion in determining that the arbitration proceedings did not appear to have been fair and regular as far as Stief was concerned. Therefore, we affirm the Board's decision not to defer to the second arbitration award.

## THE § 8(a)(1) and (3) VIOLATIONS

■■■ The Board found that the Company violated § 8(a)(1) and (3) of the Act when it discharged Stief in retaliation for his protected, concerted activities. The Company admits knowing of Stief's efforts to defeat approval of the proposed collective bargaining agreement. These activities are concerted activities carried out on behalf of the Union and its members and so are protected under § 8(a)(1) and (3) of the Act. The Company, however, claims it discharged

---

**10.** See *Herman Brothers, Inc., et al.*, Case No. 14–CA–13123, 252 N.L.R.B. No. 121, at note 3, appendix at 428–29, where this wording is used:

"Member Penello would not defer to the grievance-arbitration proceedings herein because the interests of both the employer and union members of the joint committee, which has no neutral member, appear to be aligned against the interests of the grievant on the crucial issue of whether the contract should have been ratified. Because of this appearance of bias by the committee, which controlled, presented, argued, and decided the grievance, the grievance proceedings herein do not 'appear to have been fair and regular' as required by *Spielberg.*"

We appreciate the concerns expressed in the last two paragraphs of the concurring opinion, but note that *Roadway Express, Inc.*, 145 N.L.R.B. 513 (1963), was not cited in petitioner's briefs and it appears unnecessary to discuss it.

**11.** Stief opposed the Union leadership's decision to have the Union membership ratify the contract by mail ballot (A. 403). "Stief accused [Union Steward] Hubbard of failing to properly represent the Union's members, favoring the Company, engaging in improper conduct by hitting a union member in the mouth, and demanded Hubbard's resignation" (A.406). See note 3 above.

Stief for good cause pursuant to Work Rule 6(a). Thus we are presented with yet another case in which the parties disagree as to why the employer discharged an employee.[12] *See N.L.R.B. v. General Warehouse Corp.*, 643 F.2d 965 (3d Cir. 1981); *Gould, Inc. v. N.L.R.B.*, 612 F.2d 728 (3d Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980); *Edgewood Nursing Center, Inc. v. N.L.R.B.*, 581 F.2d 363 (3d Cir. 1978). As in all such cases "[o]ur goal is to find the 'real motive,' *NLRB v. Brown*, 380 U.S. [278] at 287, 85 S.Ct. [980] at 985 [13 L.Ed.2d 839]; *NLRB v. Gentithes*, 463 F.2d 557, 560 (3d Cir. 1972) or 'real cause,' *NLRB v. Rubber Rolls, Inc.*, 338 F.2d 71, 74 (3d Cir. 1967)" behind the discharge. *N.L.R.B. v. General Warehouse Corp., supra* at 972. Both the Board and the courts have struggled to construct a legal framework to aid in the difficult, yet crucial, determination of the employer's actual motivation.

The Company first argues that the Board applied incorrect law. The ALJ applied the so-called "in-part" test under which the employer violates § 8(a)(1) and (3) if only part of the employer's reason for discharge is unlawful.[13] The Board specifically disavowed the ALJ's use of the "in-part" test and applied instead the more stringent test announced in *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 150 (1980).[14] *Wright Line* defines and allocates the burden of proof for mixed motive cases. To establish a *prima facie* case, the General Counsel must initially demonstrate that the employee's protected conduct was a "motivating factor" in the employer's decision to discharge. To rebut this, the employer then must prove it would have discharged the employee, even had the employee not engaged in protected activity.

*Wright Line*, the Company argues, is inconsistent with the law of the Third Circuit Court of Appeals as expressed in *Edgewood Nursing Center, Inc. v. N.L.R.B., supra*, and *Gould, Inc. v. N.L.R.B., supra*. The language used in these cases could possibly be interpreted as differing somewhat from the Board's shifting burdens approach stated in *Wright Line*. In *Edgewood Nursing Center, Inc.* this court explained:

"[I]f the employee would have been fired for cause irrespective of the employer's attitude toward the union, the real reason for the discharge is nondiscriminatory. In that circumstance there is no causal connection of any anti-union bias and the loss of the job. . . .

.     .     .     .     .

"Once a legitimate reason for discharge is indicated, we must determine whether there is substantial evidence to support the Board's conclusion that the reason was merely a pretext for the discharge."

581 F.2d at 368. Similarly in *Gould*, this court stated:

"[W]here an employee's discharge is prompted by concurrent reasons, some permissible and some not, . . . the Board must find that the permissible reason proffered by the employer is merely a pretext and that in fact the employee was disciplined because of anti-union sentiment."

612 F.2d at 734.

The Company here appears to argue that once it establishes a legitimate reason for the discharge, the burden shifts back to the General Counsel to prove that this reason is pretextual. The Company claims its reason for discharge was not pretextual and that the Board did not require the General Counsel to demonstrate that it was.

■ We need not decide here whether *Wright Line* and Third Circuit law differ. Under either test, assuming the General Counsel has proved an unlawful motive, the employer clearly has the burden of proving it had a legitimate reason for the discharge. The Company does not challenge the adequacy of the General Counsel's *prima facie* case. Rather, the Company argues it met its burden of proof (petitioner's brief at

---

**12.** The cases have been referred to as pretextual, mixed, or dual motive cases.

**13.** See ALJ's decision at A. 410.

**14.** The Board's decision and order is reprinted at A. 427–30.

12–13). The Board, however, reached the contrary conclusion and held the Company had failed to carry its burden of proof, i. e., that the Company's proffered excuse was not legitimate.[15]

The question thus presented is whether substantial evidence supports the Board's conclusion that the Company "has not presented persuasive evidence that it would have discharged Stief for reasons other than his [Stief's] protected activities." *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The court's review of the Board's finding in mixed motivation cases is limited; the court will accept all reasonable inferences drawn by the Board even though this court, if it considered the case de novo, might interpret the facts differently. *Labor Board v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *National Labor Rel. Bd. v. Lewisburg Chairs & Furn. Co.*, 230 F.2d 155, 157 (3d Cir. 1956).

After reviewing the record presented on appeal, we hold the inferences drawn by the Board were reasonable, and that substantial evidence supports the Board's conclusion that the Company did not fire Stief for violating Work Rule 6(a). We observe at the outset that the issue of why the Company fired Stief is a close one. Were we to consider the case *de novo*, we might make a different decision. *See N.L.R.B. v. General Warehouse Corp., supra* at 972.

The Company contends it discharged Stief in accordance with Work Rule 6(a). To determine whether the proffered reason for discharge is true, it is necessary to understand both Work Rule 6(a) and the Company's dispatch policy. Work Rule 6(a) provides that an employee who is absent for three consecutive days without notification is deemed to have voluntarily quit. The Company's dispatch policy purportedly requires an employee who has been absent ("booked himself off" or "reported off sick")[16] to call in his availability to work. According to the Company, if the employee fails to call in his availability for three days after an absence, he is deemed to have voluntarily quit under Work Rule 6(a).

The Company argues that because Stief failed to call in his availability for the three days after his October 5 absence, he was properly discharged pursuant to Work Rule 6(a). The Company emphasizes that Work Rule 6(a) is well established and that it had discharged 10 other employees for Work Rule 6(a) violations within the past three years. Because the Company was simply enforcing a well-established Work Rule, it argues it proved it had a legitimate reason for the discharge. *United Parcel Service, Inc.*, 252 N.L.R.B. No. 145, 105 L.R.R.M. 1484 (Sept. 30, 1980).

The Company's argument misses the point: it is not the applicability of Work Rule 6(a) but rather the applicability of the call-in requirement under the Company's dispatch procedure that is in dispute here. Unless Stief was obligated to call in his availability after his October 5 absence, he could not have been considered "unavailable" and therefore could not have been discharged pursuant to Work Rule 6(a).

The testimony on the call-in procedures under the Company's dispatch policy is conflicting. Stief testified that he understood the Company did not want drivers to call in under any circumstance. Dispatcher Hansen testified that drivers had to call in their availability after reporting off sick. Hansen admitted he was not aware that the drivers had ever been given copies of the Company's call-in procedures. Hansen also admitted that there were departures from the call-in rules from time to

---

**15.** "As ... Respondent has not presented persuasive evidence that it would have discharged Stief for reasons other than his protected activities, we find in agreement with the Administrative Law Judge that Stief was discriminatorily discharged." (A. 429–30).

**16.** The Company in its appellate brief represents that an employee who "is sick or has booked himself off" must call in his availability. Petitioner's brief at 5. "Dispatch Supervisor Hansen testified that drivers who report off sick are required to call in and report their availability" (A. 406).

time. Indeed, in this case, there appears to be evidence of such a departure. Stief was absent due to illness on October 4. Nonetheless, Hansen called Stief that evening to give him an assignment for the next day, October 5. Thus the record itself demonstrates that the call-in procedure was not applied consistently, at least as to Stief. Yet after Stief's October 5 absence, the Company suddenly insisted that Stief call in his availability. This inconsistency in application justifies the Board's inference that the Company's proffered excuse was not legitimate. We conclude that substantial evidence supports the Board's determination that the Company's excuse for discharging Stief was not legitimate.

We recognize that the Company went out of its way to ensure Stief knew he was to call in his availability. Twice the Company had the union steward call Stief and tell him he was expected to call in. Stief stubbornly refused to do so. Were we empowered to consider the case *de novo*, this fact might persuade us to conclude the Company had a legitimate reason to discharge Stief. Stief's stubborn refusal to call in his availability works against the peaceful resolution of labor disputes and thus against the primary goal of the Act. *Cf. Fibreboard Corp. v. Labor Board*, 379 U.S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed.2d 233 (1964). Such conduct should not be condoned or encouraged. Given this court's limited role of review, however, Stief's dubious conduct is not enough to offset the Board's conclusion, based on other evidence, that the employer did not discharge Stief pursuant to Work Rule 6(a).

Substantial evidence justifies the Board's conclusion that the Company violated § 8(a)(1) and (3). The Company admits it knew of Stief's efforts to have the union membership reject the proposed contract. The Company insisted that Stief call in his availability after his October 5 absence pursuant to a call-in procedure that was not known to Stief and had not been consistently followed by the Company in the past. Dispatcher Hansen threatened to discipline Stief if he attended the counting of the ballots on October 5. This threat consti-

tutes an uncontested, independent violation of § 8(a)(1), thus conveying the "unmistakable overtone of a purpose to discriminate and retaliate because of union membership [or the protected activity]." *National Labor Relations Board v. Ferguson*, 257 F.2d 88, 89 (5th Cir. 1958). Stief was discharged shortly after the Company learned that Stief had written the anti-contract letter and within three days of the defeat of the proposed contract. The timing of the discharge immediately after Stief engaged in protected activity supports an inference of unlawful motive. *N.L.R.B. v. General Warehouse Corp., supra* at 971.

The Company's petition for review will be denied and the Board's cross-application for enforcement will be granted.

SEITZ, Chief Judge, concurring.

I agree that the Board did not abuse its discretion in refusing to defer to the second arbitration proceeding and that substantial evidence supports the Board's conclusion that the employer violated section 8(a)(1) and (3). Because two members of the Board apparently would not have deferred to the second arbitration proceeding even if they had reopened the record to consider it, I rely on their rationale for not deferring in this case and do not think that it is necessary that I decide whether the Board abused its discretion by not reopening the record. I write separately because I believe the Board's policy of not deferring to an arbitration proceeding in a case such as the present one may be unfair to the employer.

In *Roadway Express, Inc.*, 145 N.L.R.B. 513 (1963), the Board held that it would not defer where, in addition to the absence of an impartial member, it appears from the evidence that the arbitration committee was constituted with members whose interests appeared to be aligned against the grievant. If the grievant had won at arbitration in this case, he would, of course, have been reinstated. When the employer won at arbitration, however, the Board refused to defer. The arbitration proceeding was thus a frustrating, costly hurdle for the

employer, and the employer was compelled to participate in a proceeding in which it could not really win.

It is difficult to make principled judgments as to when the interests of the grievant and the union so diverge as to justify not deferring to an arbitration award, but in a day when employees are often hostile to their union and its leadership, the Board's policy of refusing to defer when there is the "appearance" of bias on an arbitration committee may threaten the validity of the decisions of many committees that lack a neutral member. The Board may not have fully considered all of the possible ramifications of the *Roadway Express* doctrine as applied to a case such as the present one. Perhaps the Board will want to reconsider its doctrine, which is designed to promote fairness, to assure that it does not operate in a way that would be unfair to one party.