**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ANCHORAGE BUSINESSMEN'S ASSOCIATION, Drugstore Union, and Its Member Employer, et al., Respondents.**

No. 16764.

United States Court of Appeals Ninth Circuit.

March 29, 1961.

**620**

Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Rosanna A. Blake and Allan I. Mendelsohn, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

D. A. Burr, G. F. Boney, and Wayne Calderwood, Anchorage, Alaska, for respondent.

Before HAMLEY, MERRILL and KOELSCH, Circuit Judges.

MERRILL, Circuit Judge.

Respondent Anchorage Businessmen's Association (hereinafter designated "Association") is a multi-employer bargaining association. The National Labor Relations Board on August 21, 1959, found the Drugstore Unit of the Association and its member companies to have been guilty of unfair labor practices committed in Anchorage, Alaska.

The matter is before us on the Board's petition pursuant to § 10(e) of the National Labor Relations Act, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq., for enforcement of its order entered against respondents. The decision and order of the Board are reported in 124 N.L.R.B. 72.

The practices found to be unfair occurred in the course of a dispute between the Association and Retail Clerks Union, Local 1496, over the terms of a collective bargaining agreement then being negotiated on behalf of those employed as retail clerks by the drugstores of Anchorage. The case presents two issues:

(1) In the course of negotiation, the pharmacist employees withdrew from the union and formed their own independent union organization: the Anchorage Professional Pharmacists Association (hereinafter designated "Independent"). The Board has found that the Association interfered with the formation and administration of the Independent and contributed support and assistance to it contrary to § 8(a) (2) of the National Labor Relations Act, 29 U.S.C. § 158(a) (2).[1] Respondents challenge this finding.

(2) In the course of negotiations, the Clerks' Union struck and picketed three of the eleven stores represented by the Association. The eight non-struck members of the Association then laid off all union employees, but continued to employ its pharmacists and non-union clerks and to remain open for business. The Board concluded that this was conduct in violation of §§ 7 and 8(a) (1) and (3).[2] Respondents contend that the layoff was a

1. Section 8(a) (2):
   "It shall be an unfair labor practice for an employer * * * to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. * * *"

2. Section 7:
   "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective

bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."
Section 8(a):
   "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * *

proper defense to a whipsaw strike[3] which imperiled their bargaining association.

■ We turn to the first question—whether the Association interfered with the organization and administration of the Independent and contributed support and assistance to it. The Board was concerned with the degree to which the organization and administration of the Independent was carried on by supervisory employees of the stores.

The first move made by the pharmacists toward withdrawal from the Union was made by a group of about six who demanded withdrawal cards. Of these, five were store managers or assistant managers. One of the managers was part owner of three stores. The organization meeting of the Independent was called by a part owner. Incorporation papers were drawn by the attorney for the Association. The incorporators were three managers. Upon organization of the Independent, the officers were composed of store managers as president and vice-president. One of the board of directors was a store manager. Among the membership were more managers and assistant managers. There is little evidence that any rank and file pharmacist played any active role in either the organization or administration of the Independent.

In bargaining which took place between the Association and the Independent, the negotiating committee for the Independent included two managers. The contract proposed by the Independent did not contain a union security clause. The Association insisted that one be included "for the protection of the contract."[4]

The trial examiner concluded that the Independent had been dominated by the Association. The Board refused to go this far. It did, however, find interference and assistance. It concluded:

"Upon the entire record we find that by acquiescing in its supervisor's participation in voting at Independent meetings affecting the administration of the Independent, dealing with the Independent's negotiating committee which included two store managers, and by entering into a union-security agreement with the Independent before · the latter complied with the filing requirement of section 9(f) (g) and (h), the Association and its members employers interfered with the formation and administration of the Independent and contributed support and assistance to it in violation of 8(a) (2) and (1) of the Act."

Such conduct was recently held to constitute interference in Local 636 of United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry, etc. v. National Labor Relations Board, D.C.Cir., 1961, 287 F.2d 354. We find no error in the Board's ruling.

■ We turn to the second question which this case presents: whether the nonstruck members of a multi-employer bargaining association may defend against a strike against three of its members, by laying off only their union employees. In defense of its conduct the Association relies upon National Labor Relations Board v. Truck Drivers Local Union, 1957, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676; National Labor Relations Board v. Great Falls Employers' Coun-

---

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

3. " 'Whipsawing' is the process of striking one at a time the employer members of a multi-employer association." National Labor Relations Board v. Truck Drivers Local Union, 1957, 353 U.S. 87,

90 (footnote 7), 77 S.Ct. 643, 644, 1 L.Ed.2d 676.

4. It is conceded that the Independent was not then in compliance with § 9(f) (g) (h) of the Act and that such compliance is a prerequisite to a valid union security agreement; that this in itself constituted a violation of § 8(a) (3) and (1) on the part of the Association.

cil, 9 Cir., 1960, 277 F.2d 772; and Leonard v. National Labor Relations Board, 9 Cir., 1952, 197 F.2d 435; Id., 9 Cir., 1953, 205 F.2d 355.

The Board distinguishes the cited cases upon the ground that they do not present a case of discrimination in the lockout. All employees were locked out. The Board asserts that a lockout of only union employees is (under § 8(a) (3), as quoted supra, footnote 2) discrimination in regard to tenure of employment and terms and conditions of employment such as to discourage membership in a labor organization.

National Labor Relations Board v. Truck Drivers Local Union, supra, holds that where a whipsaw strike threatens destruction of the employers' interest in bargaining on a group basis, a temporary lockout may lawfully be resorted to as a defensive measure. The opinion points out at page 92 of 353 U.S., at page 645 of 77 S.Ct. that there is no express statutory provisions either prohibiting or authorizing a lockout and that it is not therefore unlawful per se.

■ ■ We note also, however, that the whipsaw strike is not declared by law to be an unfair labor practice. It is simply a tactic against which a multi-employer group is justified in defending itself by lawful means. In the case before us, as the Board held, the layoff involved discrimination such as is expressly made unlawful by § 8(a) (3). A layoff which is confined to union members operates to the disadvantage of such members and, since membership is all that precludes continuing employment, is calculated to discourage union membership.

We cannot agree with respondents that the circumstances are such as to demonstrate that this layoff was a legitimate bargaining weapon. The adversaries in this process of bargaining are the employer on the one hand and all of his employees on the other. The union acts in a representative capacity for all employees. The bargain, when reached, will operate to the benefit of all employees irrespective of union membership.

Those laid off by these respondents could not then rationally conclude that they had been subjected to pressure only because they were members of a group engaged in collective bargaining on whose behalf a contract was being negotiated. They would have to conclude, as do we, that they had been selected from the larger group to serve as objects of the employers' pressure only because of their union membership. The purpose of the layoff then would not appear to be that of weakening the determination and bargaining resolve of the employees as a group. Rather, it would appear to be that of weakening the union and reducing its effectiveness as a representative of the employees. In National Labor Relations Board v. Truck Drivers Local Union, supra, 353 U.S. at page 93, 77 S.Ct. at page 646, the court expressly distinguished the lockout with which it was concerned from one "designed to destroy or undermine bargaining representation."

We conclude that the Board was correct in holding this lockout to be in violation of § 8(a) (3) and (1).

The Association protests that to require a lockout of all employees would require the nonstruck employers to close their doors while the struck employer could continue to operate with nonunion help; that this would as effectively destroy their interest in bargaining on a group basis as would passive submission to a whipsaw strike.

We do not hold that the nonstruck employers must close their doors. Whether they can continue in busines, employing temporary help who are not concerned with the pending negotiations, is a question we do not reach.

Decree will be entered enforcing the order as prayed.