ALASKA COMMUNITY COLLEGES'
FEDERATION OF TEACHERS,
LOCAL NO. 2404, Appellant,

v.

UNIVERSITY OF ALASKA, Jay Barton
as President; and Edward Rasmuson,
Jeffry Cook, Don Able, Jr., Herbert
Lang, Mildred Banfield, Hugh Fate, Jr.,
Margaret Hall, Sam Kito, Jr., Thomas
Miklautsch, Sharilyn Mamaw and John
Shively, Members of the Board of Re-
gents, as Agents; State of Alaska, La-
bor Relations Agency, Appellees.

No. 6881.

Supreme Court of Alaska.

Sept. 16, 1983.

William K. Jermain, Jermain, Dunnagan & Owens, Anchorage, for appellant.

Terrance A. Turner, Owens & Turner, Anchorage, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ. and SCHULZ, Superior Court Judge.*

OPINION

MATTHEWS, Justice.

This appeal from an order of the superior court affirming in part an order of the Alaska Labor Relations Agency (ALRA) concerns four unfair labor practice charges filed pursuant to the Public Employment Relations Act, AS 23.40.070–AS 23.40.260. Those charges, filed by the Alaska Community Colleges' Federation of Teachers, Local 2404 (Union) against the University of Alaska (University), are as follows:

(1) The University committed an unfair labor practice by its Board of Regents' failure to ratify a tentative collective bargaining agreement reached by its negotiators and negotiators for the Union.

(2) The University committed an unfair labor practice by imposing work rule changes without first bargaining with the Union over them.

(3) The University committed an unfair labor practice by denying summer employment to Arthur Petersen, a Union negotiator.

(4) The University committed an unfair labor practice by denying the accrual of annual and sick leave to Union President Ralph McGrath.

The ALRA determined that the charges relating to Petersen, McGrath and the

Board's failure to ratify the tentative agreement were without merit. However, it concluded that the University did commit an unfair labor practice by unilaterally changing work rules. As a remedy for this violation, the ALRA ordered the work rule changes rescinded in their entirety and reinstituted all the terms of a previously expired collective bargaining agreement until such time as the parties had an opportunity to bargain with regard to the proposed changes.

The superior court affirmed as to the charges relating to Petersen, McGrath and the failure to ratify. The court further agreed that the University committed an unfair labor practice by failing to bargain with the Union over the work rule changes. However, the court differed with the ALRA as to the appropriate remedy for this bargaining violation. It concluded that the ALRA erred insofar as the ALRA failed to distinguish between mandatory and permissive subjects of bargaining in its remedial orders.

We affirm the order of the superior court for the reasons set forth below.

I

FAILURE TO RATIFY TENTATIVE AGREEMENT

The Union and the University were bound by a collective bargaining agreement from July 1, 1976 to June 30, 1979. The University gave notice to the Union that it wished to terminate the old agreement and negotiate a new one to take effect July 1, 1979. At the beginning of the negotiations, the parties agreed to the following ground rule:

Any proposal, once signed by all parties, shall cease to be an object of further negotiations, and is subject only to ratification of the entire agreement by the Union membership and the Board of Regents.

* Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

A tentative agreement between the negotiators was reached on June 25 when the Union negotiators, the University negotiators and the State Department of Administration signed off on all contract proposals. The Union obtained the ratification of its membership on June 26 and 27, and on June 28 it reported the ratification to the Board of Regents.

The Board of Regents considered the tentative agreement in executive session on June 28 and 29. It then informed the Union that it would take no further action until July 20. The University states that the reason for the postponement was to allow incoming University President Barton to make a recommendation on whether the tentative agreement should be ratified. President Barton assumed his office on July 16, and after he had reviewed the tentative agreement he recommended that it not be ratified.

On July 20, the Board of Regents again met in executive session to consider the tentative agreement. Following that session, the Board announced that it was rejecting the tentative agreement and directed President Barton to reconstitute the University bargaining team and return to the bargaining table.

The Union alleges that the Board's failure to ratify the tentative agreement was a breach of its duty to bargain in good faith and hence an unfair labor practice pursuant to AS 23.40.110(a)(5), which provides:

> *Unfair labor practices.* (a) A public employer or his agent may not
>
> . . . .
>
> (5) refuse to bargain collectively in good faith with an organization which is the exclusive representative of employees in an appropriate unit. . . .

■ Specifically, the Union contends that the Board rejected the agreement because certain proposals of the University's bargaining team incorporated in the agreement were found by the Board to be unacceptable. Under the Labor Management Relations Act, 29 U.S.C. §§ 141–187 (1976), it has been held that repeated shifts in bargaining positions on the part of an employer whenever a tentative agreement is reached are evidence of a refusal to bargain collectively in good faith.[1] *N.L.R.B. v. Big Three Industries, Inc.,* 497 F.2d 43, 47 (5th Cir.1974); *San Antonio Machine & Supply Corp. v. N.L.R.B.,* 363 F.2d 633, 636–41 (5th Cir.1966); *Sigmund Freisinger,* 10 N.L.R.B. 1043, 1050, *supp. decision,* 15 N.L.R.B. 831 (1939); *K Mart Corp.,* 242 N.L.R.B. 855, 874–77 (1979), *enforced,* 626 F.2d 704 (9th Cir.1980). Likewise, an employer's refusal to sign a collective bargaining agreement which reduces to writing the terms agreed upon with a union constitutes a violation of the Labor Management Relations Act. *N.L.R.B. v. Strong,* 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546, 549 (1969); *Young's Metal Fabricators & Roofing, Inc.,* 241 N.L.R.B. 978, 982 (1979). However, in *Bronson Methodist Hospital,* 223 N.L.R.B. 95, 98–99 (1976), it was held that an employer did not unlawfully refuse to execute an agreement where it was made clear to the union that submission of the proposed contract to the employer's board of directors was a condition precedent to the existence of a final and binding contract. Thus, under the Labor Management Relations Act it is permissible for an employer to refuse to ratify a tentative agreement in accordance with an agreed upon ground rule, so long as the employer's failure to ratify does not appear to have resulted from the employer's intent to string out negotiations and avoid reaching agreement. *See N.L.R.B. v. Alterman Transport Lines, Inc.,* 587 F.2d 212, 221 (5th Cir.1979).

■ The ALRA declined to draw an inference that the Board's failure to ratify resulted from an intent to prolong negotia-

---

1. In *Alaska Pub. Employees Ass'n, Inc. v. Mun. of Anchorage,* 555 P.2d 552, 553 (Alaska 1976), we stated that we will consider the experiences of the National Labor Relations Board "in remedying unfair labor practices to be highly relevant to the performance of those functions by locally created labor boards . . . ." *See also* 2 AAC 10.250(c). Thus, decisions concerning the Labor Management Relations Act are pertinent to this issue, as well as to the other issues in this appeal.

tions and avoid reaching an agreement. Rather, it concluded that the Board was simply exercising its option to disapprove the tentative agreement in accordance with the agreed upon ground rule.[2] The superior court affirmed the ALRA on this point. Since there is substantial evidence in the record that the Board did not reject the tentative agreement because its own bargaining proposals were found unacceptable, we conclude that the ALRA's failure to draw an inference of bad faith bargaining was reasonable and should not be set aside.[3] *See City of Fairbanks v. Alaska Public Utilities Commission,* 611 P.2d 493, 495 (Alaska 1980) (administrative agency's factual findings will not be set aside if they are supported by substantial evidence on the whole record). Accordingly, we affirm the order of the superior court on this issue.

## II

### WORK RULE CHANGES

After the Board of Regents rejected the tentative contract, it ordered President Barton to reconstitute the University negotiating team and return to the bargaining table. On July 23, Manager of Labor Relations Johnson notified the Union in writing that he had been appointed the new chief

negotiator for the University and that the University desired an immediate resumption of collective bargaining. An ensuing exchange of correspondence between Johnson and Union President Ralph McGrath suggested that a prompt return to the bargaining table would not occur.

With the regular school year rapidly approaching, the old collective bargaining agreement expired and no return to the bargaining table in sight, on August 23 the University unilaterally imposed a new set of "work rules" governing its relations with bargaining unit members. There was no discussion of the new work rules with the Union prior to their imposition. The University concedes that some of the work rules concerned mandatory subjects of bargaining (i.e., wages, hours, and other terms and conditions of employment). *See* AS 23.40.070(2). The Union promptly filed unfair labor practice charges with the ALRA, alleging that the University's unilateral imposition of new work rules violated AS 23.-40.110(a)(5).

The ALRA determined that the unilateral imposition of new work rules by the University constituted an unfair labor practice.[4] To remedy this bargaining violation,

2. The ALRA's decision states:

> The Agency finds as a matter of fact, that under the terms of the ground rules agreed to between the parties, the Board of Regents had the right to review the contract as a whole and to determine whether or not to ratify it. They acted in compliance with the ground rules. The Agency concludes as a matter of law, that by so doing, the Board of Regents of the University of Alaska did not commit an unfair labor practice.

3. The Union contends that the Board, through President Barton, stated that its objections to the tentative agreement were based on University bargaining proposals concerning annual leave, class size and workload. Indeed, these three items were the only provisions which President Barton specifically indicated as being objectionable in his statements to the Union membership and the press, and these items are labeled as University proposals in the tentative agreement. Nevertheless, the record also contains substantial evidence that these provisions did not derive from bargaining proposals advanced by the Board of Regents. Evan Johnson was the Manager of Labor Relations for the

University, and he participated in the negotiations which resulted in the tentative agreement. Johnson testified that to describe the tentative agreement's terms on annual leave, class size and workload as University proposals was an oversimplification. He stated that these provisions were the results of compromise between the University's negotiators and the Union's negotiators, designed to take into consideration concerns expressed by the Union.

4. The ALRA's decision states:

> The Agency finds as a matter of fact, that bargaining had not reached an impasse and that the parties were engaged or prepared to engage in collective bargaining. The University failed to submit its desired work rule changes to collective bargaining prior to implementing them. The Agency concludes as a matter of law, that under the provisions of AS 23.40.070 et seq., the University had an obligation to bargain with the representatives of the Union and that its failure to submit its desired work rules to collective bargaining prior to implementing them constituted an unfair labor practice.

the ALRA ordered that the new work rules be rescinded until the parties had an opportunity to negotiate with regard to them. It further ordered that the new work rules not be reintroduced until such time as the negotiations reached an impasse.

The University petitioned the ALRA to reconsider its order, arguing that the order improperly required it to bargain with the Union over work rule changes unrelated to subjects concerning which it had a statutory duty to bargain. The ALRA stayed its order pending reconsideration, and on December 21 it entered an order which stated in relevant part:

*Findings of Fact*

1. The work rules contained in a letter of August 20, 1979 from the University to the Union were imposed unilaterally.

2. Prior to the imposition of the work rules no attempt had been made to bargain with respect to them.

. . . .

5. The Agency is not presently required to decide whether any particular issue presently in dispute between the parties is a mandatory or permissive subject of bargaining.

*Conclusions of Law*

1. The unilateral imposition of work rule changes without engaging in negotiations with respect to them is an unfair labor practice.

2. The terms and conditions of employment contained in the previous agreement should be continued in effect until such time as the parties have an opportunity to conduct negotiations with regard to the proposed changes requested by the parties.

The University appealed the ALRA's order to superior court. Again it argued that, because its statutory duty was merely to bargain over wages, hours and conditions of employment (i.e., mandatory bargaining subjects), and because some of the work rules concerned subjects unrelated to those topics (i.e., permissive bargaining subjects), it was error for the ALRA to rescind the work rules in their entirety. Likewise, it argued that the ALRA erred in reinstituting those terms of the prior agreement which concerned permissive bargaining subjects. However, prior to the hearing in superior court, the parties reached and ratified a new collective bargaining agreement, and the superior court, while accepting the University's arguments, determined that the new agreement vitiated the necessity of a remand. The court stated:

The reason for extending the terms of an expired contract is to facilitate bargaining, and, therefore, if the parties are not, in the first instance, required to bargain on a particular topic, there is no reason for extending any existing agreement as to that term.

The Court finds that the ALRA did err in refusing to distinguish between mandatory and permissive subjects of bargaining and in extending the contract in its entirety prior to making such a distinction.

However, because the parties have subsequently entered into a new labor contract, no controversy exists at this time as to these issues, and the Court does not feel a remand to the ALRA for such a

---

The ALRA's decision in this regard accords with substantial authority holding that, absent a true impasse in negotiations, unilateral action by an employer concerning mandatory bargaining subjects is a violation of the duty to bargain in good faith, imposed by section 8(a)(5) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(5) (1976), which is substantially similar to AS 23.40.110(a)(5). *See, e.g., Carpenter Sprinkler Corp. v. N.L.R.B.,* 605 F.2d 60, 64 (2nd Cir.1979); *New York Printing Pressmen and Offset Workers Union No. 51 v. N.L.R.B.,* 538 F.2d 496, 501 (2nd Cir.1976); *N.L.R.B. v. Dent,* 534 F.2d 844, 845–46 (9th Cir.1976).

This prohibition against unilateral action applies even after the expiration of a prior agreement. *N.L.R.B. v. Cone Mills Corp.,* 373 F.2d 595, 598–99 (4th Cir.1967); *Hinson v. N.L.R.B.,* 428 F.2d 133, 137 (8th Cir.1970) (per curiam, opinion on rehearing); *Clear Pine Moulding, Inc. v. N.L.R.B.,* 632 F.2d 721, 729 (9th Cir. 1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841, *reh'g denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 985 (1981); *N.L.R.B. v. Sky Wolf Sales,* 470 F.2d 827, 830 (9th Cir.1972). The University does not contest this aspect of the ALRA's decision.

determination at this time, for what would in effect be an advisory opinion, is appropriate.

*Alaska Community Colleges' Federation of Teachers, Local No. 404 v. University of Alaska,* Nos. 3 AN–79–8303 and 3 AN–80–399 Civil (Alaska Super., April 13, 1982).

■ Since the Union and the University are presently bound by a new collective bargaining agreement, the question whether the ALRA erred in failing to distinguish between mandatory and permissive subjects of bargaining is moot. However, both parties argue that we should nonetheless consider this issue pursuant to the public interest exception to the mootness doctrine. Under the public interest exception, a moot issue will be considered "where the matter is one of grave public concern and is recurrent but is capable of evading review." *Doe v. State,* 487 P.2d 47, 53 (Alaska 1971).

In *Alaska Transportation Commission v. Gandia,* 602 P.2d 402, 403 (Alaska 1979), we held that a challenge to the procedures of the Alaska Transportation Commission would be decided despite the technical mootness of the issues:

> Though the stipulation for dismissal has rendered the issues technically moot, we believe that the superior court's order will have an effect upon future ATC [Alaska Transportation Commission] proceedings with consequences for the Commission and the Alaska transportation industry as a whole; hence we have elected to decide these issues.

Likewise, the superior court's order in the present case will have an effect on future ALRA proceedings with wide-ranging consequences. We will therefore consider whether the ALRA exceeded its authority in failing to distinguish between mandatory and permissive subjects of bargaining.

AS 23.40.140 states the authority of the ALRA in remedying unfair labor practices. It provides:

> *Orders and decisions.* If the labor relations agency finds that a person named in the written complaint or accusation has engaged in a prohibited practice, the labor relations agency shall issue and serve on the person an order or decision requiring him to cease and desist from the prohibited practice and to take affirmative action which will carry out the provisions of AS 23.40.070–23.40.260. If the labor relations agency finds that a person named in the complaint or accusation has not engaged or is not engaging in a prohibited practice, the labor relations agency shall state its findings of fact and issue an order dismissing the complaint or accusation.

■ We hold that this provision requires the ALRA to distinguish between mandatory and permissive bargaining subjects in its remedial orders. It authorizes the ALRA to issue cease and desist orders barring prohibited practices, and to order affirmative action which will carry out the provisions of the Public Employment Relations Act. The Act, however, does not require employers to bring to the bargaining table subjects other than wages, hours, and other terms and conditions of employment. *See* AS 23.40.070(2). Employers are free to make unilateral changes on matters which fall outside these mandatory subjects of bargaining, as they are under the Labor Management Relations Act. *See Allied Chemical & Alkali Workers of America v. Pittsburg Plate Glass Co.,* 404 U.S. 157, 164, 92 S.Ct. 383, 389, 30 L.Ed.2d 341, 349 (1971); *Hinson v. N.L.R.B.,* 428 F.2d 133, 137–38 (8th Cir.1970) (per curiam, opinion on rehearing); R. Gorman, Labor Law, at 443 (1976); *cf Kenai Peninsula Borough School District v. Kenai Peninsula Education Association,* 572 P.2d 416, 418–22 (Alaska 1977) (construing AS 14.20.550 and AS 14.20.610 to require that only salaries, fringe benefits, number of hours worked and amount of leave time be negotiated in collective bargaining with teachers in public schools). The ALRA therefore erred insofar as it rescinded work rules pertaining to permissive bargaining subjects and ordered the extension of terms in the previously expired collective bargaining agreement pertaining to permissive bargaining subjects.

## III

### DENIAL OF SUMMER EMPLOYMENT TO PETERSEN

Arthur Petersen was selected to be a negotiator for the Union in its collective bargaining with the University during the spring and summer of 1979. Prior to the negotiations, Petersen applied to teach English 111, a course he had taught numerous times before, during the approaching summer session at Juneau-Douglas Community College. Upon receiving Petersen's application, Randall Ackley, the Director of Arts and Sciences at Juneau-Douglas, sent Petersen a memorandum stating,

I signed your [travel request]. I noted that it said your business in Anchorage was "negotiation".

Does that mean you will be busy this summer and *not* be available for teaching?

We have placed an ad for summer school teachers, and I will be making selections and assignment based upon *best qualified* next week.

I would like to know if you will be in that applicant pool along with Silva and Hubbard? [Emphasis in original.]

Petersen promptly responded, "I wish to be considered for English 111. Negotiations, if they occur, (or even when) do not affect my availability to teach English 111."

On April 26, another applicant, Ron Silva, was selected to teach English 111. Silva was the most experienced English teacher on the faculty, and Ackley testified that he considered him to be the best qualified applicant. Silva declined to teach the class a few days later, apparently confused as to the number of English courses available. Ackley sent Silva a memo clarifying the situation and asking him to reconsider, and on May 9 he again recommended Silva to teach the class. He also recommended

Nancy Spector as an alternate if Silva declined again.

By this time Petersen was becoming annoyed because Ackley still had not made the summer school assignment. Ackley wrote to him and explained that he had already recommended Silva to teach the class, although he noted that Silva had recently declined the appointment a second time. Ackley's memorandum to Petersen went on to state:

My recommendations go to Dr. Oremus, as you know. I have discussed my recommendations with Dr. Oremus and he had given oral approval for Ron [Silva] to teach the class. I also have discussed your application and Dr. Oremus contacted the Contract Manager concerning the question of the availability of negotiators for summer staff.

The response was that negotiators would be busy on almost a daily basis. For those out of town, this may cause difficulties in a regular teaching assignment. Given the amount of time you have been in Anchorage to date Dr. Oremus feels that the students would be disadvantaged by your frequent required absences and that this must be considered in selecting an instructor.

I have acted in good faith and with as much speed as possible under the circumstances. I made my recommendation as soon as possible. I selected Ron Silva as best qualified. His refusal forces me to make another recommendation.

In accordance with his earlier decision, Ackley subsequently recommended Nancy Spector, who had also been teaching English 111 during the regular year, as the next best qualified person to teach the course. Spector accepted, and was assigned to teach the course, and then a week later phoned Ackley to inform him that she had reconsidered and no longer desired the position.[5]

5. Meanwhile, Petersen wrote to Mike Paradise, Chancellor of the University of Alaska, Juneau, complaining that he had been discriminated against in the filling of summer positions. Paradise's reply states:

Art, it appears from my preliminary inquiries that Dr. Ackley has attempted to act in such a way as to protect the best interests of the students in the case of summer employment, on which you wrote me your June 2, 1979 memo.

At this point Ackley checked the registration for the course, which had been open approximately five or six weeks, and discovered that only one or two students had signed up. The course was scheduled to begin within a few weeks. Because he preferred not to offer the course with that few students in attendance, the course was then cancelled.[6]

The Union contends that the University committed an unfair labor practice by denying Petersen summer employment because of his activities as a negotiator, in violation of AS 23.40.110(a)(1) and .110(a)(3). Those provisions read as follows:

> *Unfair labor practices.* (a) A public employer or his agent may not
>
> (1) interfere, restrain or coerce an employee in the exercise of his rights guaranteed in AS 23.40.080;[7]
>
> . . . .
>
> (3) discriminate in regard to hire or tenure of employment or a term or condition of employment to encourage or discourage membership in an organization;
>
> . . . .

■ AS 23.40.110(a)(1) and .110(a)(3) are substantially similar to sections 8(a)(1) and 8(a)(3) of the Labor Management Relations Act, 29 U.S.C.A. §§ 158(a)(1) and 158(a)(3) (1976). Conduct which violates section 8(a)(3) of the Labor Management Relations Act—employer discrimination in hiring, firing or working conditions—also coerces or restrains employees in their rights to organize, bargain collectively and engage in other concerted activities, in violation of section 8(a)(1). *Allied Industrial Workers, AFL–CIO Local Union No. 289 v. N.L.R.B.,* 476 F.2d 868, 877 (D.C.Cir.1973); *National Cash Register Co. v. N.L.R.B.,* 466 F.2d 945, 962

(6th Cir.1972), *cert. denied,* 410 U.S. 966, 93 S.Ct. 1442, 35 L.Ed.2d 700 (1973); *see, e.g., N.L.R.B. v. Anchorage Businessmen's Association,* 289 F.2d 619 (9th Cir.1961). Thus, applying this approach to the Alaska provisions, a violation of AS 23.40.110(a)(3) derivatively results in a violation of AS 23.40.110(a)(1) as well.

■ To establish a violation of section 8(a)(3) of the Labor Management Relations Act, the employer's action generally must have been based on an antiunion motive. *Midwest Regional Joint Board v. N.L.R.B.,* 564 F.2d 434, 440 (D.C.Cir.1977); *Wheeling Pittsburgh Steel Corp. v. N.L.R.B.,* 618 F.2d 1009, 1019 (3d Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *N.L.R.B. v. Southern Plasma Corp.,* 626 F.2d 1287, 1293 (5th Cir.1980); *reh'g denied,* 633 F.2d 1210 (1981); *Federal Mogul Corp. v. N.L.R.B.,* 566 F.2d 1245, 1259 (5th Cir.1978); *Loomis Courier Service, Inc. v. N.L.R.B.,* 595 F.2d 491, 495 (9th Cir.1979). Only where the employer's conduct is "inherently destructive" of important employee interests is proof of an antiunion motive unnecessary under that section. *N.L.R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027, 1034 (1967); *Wheeling Pittsburgh Steel Corp.,* 618 F.2d at 1019; *Loomis Courier Service, Inc.,* 595 F.2d at 495. The requirements for establishing a violation of section 8(a)(1) of the Labor Management Relations Act—interference with, restraint or coercion in the exercise of rights to organize—are less exacting, and focus more upon the effects of the employer's conduct than upon its motivation. The test under that section is whether the employer's conduct reasonably tends to interfere with the free exercise of

---

Since you are a member of the negotiating team, he feels that he cannot depend on your presence on campus during the course of the summer session. The students deserve to have not only the best qualified person but also one who will be here consistently and uninterruptedly during the duration of the offering of the class.

**6.** Had Petersen been assigned to teach the course, section 7.1(B) of the former collective bargaining agreement states that he would be

reassigned to another task carrying equivalent compensation in the event the course did not materialize.

**7.** AS 23.40.080 provides:

*Rights of public employees.* Public employees may self-organize and form, join or assist an organization to bargain collectively through representatives of their own choosing, and engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

employees' rights.[8] *N.L.R.B. v. Litho Press of San Antonio,* 512 F.2d 73, 76 (5th Cir. 1975); *Time O Matic, Inc. v. N.L.R.B.,* 264 F.2d 96, 99 (7th Cir.1959); *Munro Enterprises, Inc.,* 210 N.L.R.B. 403 (1974). Nonetheless, with the rarest of exceptions, *see, e.g., N.L.R.B. v. Burnup & Sims, Inc.,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), a discharge or lesser discipline for an employee's membership in or activities in support of a union will not be deemed to be a violation of either section 8(a)(1) or 8(a)(3) absent proof of an antiunion animus. *See* R. Gorman, Labor Law, at 137–38 (1976). Applying these principles to AS 23.40.-110(a)(1) and .110(a)(3), the Union was required to demonstrate that Petersen was denied summer employment because of some antiunion motive on the part of the University.

The ALRA determined that the failure to hire Petersen was not an unfair labor practice.[9] The superior court concluded that the ALRA's findings were supported by substantial evidence in the record and affirmed. We agree with this conclusion. The Union has not established the presence of an antiunion motive for failing to hire Petersen. Ackley testified that the reason Petersen was not hired was initially because more qualified applicants were available, and ultimately because a lack of student interest caused the class to be cancelled. Although the Union presented correspondence which demonstrated that the University considered Petersen's unavailability in determining his qualification, Ackley unequivocally testified that it was the mere fact of Petersen's unavailability, not the reason therefor, which was considered in this regard. Because this does not demonstrate an antiunion motive, we hold that the ALRA's findings are supported by sub-

stantial evidence and affirm the order of the superior court on this issue.

## IV

## DENIAL OF ANNUAL AND SICK LEAVE TO McGRATH

From January 1 to May 23, 1979, Ralph McGrath, the President of the Union, was on professional developmental leave while attending graduate school in Hawaii. Upon his return to teaching duties, McGrath discovered that he had not been credited with annual and sick leave during the time of his developmental leave. He was informed by the University's payroll and personnel offices that he was not entitled to the accrual of annual and sick leave while on professional developmental leave, since it was against University policy. Those offices referred McGrath to two Board of Regents policies developed prior to the time of the then existing collective bargaining agreement, which stated that faculty on sabbatical leave were not entitled to accrue annual and sick leave.

The Union alleges that the denial of annual and sick leave to McGrath constituted an unfair labor practice. Again, the Union contends that AS 23.40.110(a)(1) and .110(a)(3) were violated. Specifically, the Union contends that the University had a policy of accruing annual and sick leave for faculty members on developmental leave, and that it denied those benefits to McGrath because he was a Union official. To support the contention that such a policy existed, the Union points to a memorandum written by Carl Westman, a former Contract Manager for the University, which interpreted section 9.1(I) of the former collective bargaining agreement as follows:

> The Agency finds as a matter of fact, that the University did not refuse to allow Mr. Petersen to teach the course because of his Union activities and that Mr. Petersen was not coerced in the exercise of his rights. The Agency concludes as a matter of law that the University did not commit an unfair labor practice by failing to let Mr. Petersen teach the course.

---

8. There is, however, an important qualification to the seemingly unqualified language of section 8(a)(1). Even conduct which interferes with, restrains or coerces employees in the exercise of their collective rights may be held lawful if it advances a substantial and legitimate employer interest. R. Gorman, Labor Law, at 133 (1976).

9. The ALRA's decision states:

There is a contractual definition of the accrual status for persons on developmental leave. Section 9–1(i) of the faculty contract states that: "A faculty member on development leave is still an employee of the University for purposes of payment into the retirement fund and contributions to the group health and life insurance and *similar fringe benefit programs to the extent that the leave recipient participates in them.*" In other words, the leave recipient would accrue annual leave and accumulate sick leave as though he/she were still on the job at the University. [Emphasis in original].

The Westman memorandum is dated August 19, 1977, and it states that copies were sent to all personnel directors in the University.[10]

The University contends that, contrary to the appearances of the Westman letter, no policy of accruing annual and sick leave for faculty members on developmental leave existed. It introduced the testimony of Manager of Labor Relations Johnson to rebut the Union's contentions. Johnson testified that he had not seen the Westman memorandum before and that McGrath never brought it to his attention. He also stated, "[i]n checking [whether such a policy existed], the indication I have is that the policy is that the only time that leave, annual leave or the disability leave is accrued is during the status of active employment, that it is not granted during those times the person is on sabbatical, or professional developmental leave." Johnson further testified that there had "been no singling out of anyone to apply this policy in a discriminatory manner."

The ALRA determined that no unfair labor practice occurred in the University's denial of annual and sick leave to McGrath.[11] The superior court affirmed the ALRA on this issue.

■■■ The issue before this court is whether there is substantial evidence in the record to support the ALRA's finding that the Union failed to establish the existence of a University policy of accruing annual and sick leave while faculty members were on developmental leave. There can be no meritorious claim of coercion or discrimination unless it is established that leave accrual was granted to others but denied to McGrath. The ALRA's findings are supported by substantial evidence. First, there is the testimony of Manager of Labor Relations Johnson, summarized above, that no accrual policy existed. Second, there is section 9.4(A)(3) of the former collective bargaining agreement, which was in effect at the time McGrath was denied leave accrual. That section specifically states that temporary disability leave (i.e., sick leave) is not earned during developmental leave. Third, there is no evidence that a faculty member was ever allowed to accrue annual and sick leave pursuant to the terms of the Westman memorandum. We thus conclude that the memorandum does not render the evidence supporting the ALRA's determination insubstantial in light of the entire record and affirm the order of the superior court in this regard as well.

For the foregoing reasons, the order of the superior court is AFFIRMED.

RABINOWITZ, Justice, dissenting.

I dissent from Part III of the court's opinion upholding the ALRA determination that the University's failure to hire Arthur Petersen for the summer of 1979 was not an unfair labor practice. On this issue I would

---

**10.** Westman was not called to testify concerning this memorandum or his authority to develop University policy, although he was called by the Union to testify concerning other matters.

**11.** The ALRA's decision states:

The Agency finds as a matter of fact that the Union has failed to meet its burden of proof of the fact that the University of Alaska does maintain a policy allowing individuals on developmental leave to accrue annual leave and sick leave. The final sentence of the paragraph [of the Westman memorandum] is no more than Mr. Westman's opinion of the meaning of the previous sentence and not a portion of that sentence itself. The Agency concludes as a matter of law that the failure to grant Ralph McGrath annual leave and sick leave while on developmental leave was not an unfair labor practice.

remand for factual findings under AS 23.-40.110(a)(1).

It is clear from the record that the University of Alaska weighed Petersen's role as a union negotiator as an important factor in evaluating his application for summer employment.[1] Correspondence between University administrators and Petersen establishes this fact. For example, the Chancellor of the University of Alaska, Juneau stated the following in a letter to Peterson:

> Since you are a member of the negotiating team, [the Director of Arts and Sciences] feels that he cannot depend on your presence on campus during the course of the summer session. The students deserve to have not only the best qualified person but also one who will be here consistently and uninterruptedly during the duration of the offering of the class.

The University of Alaska contends, and the majority agrees, that this factor was considered only to the extent that Petersen's status as negotiator would cause frequent absences from Juneau during the summer session.

It is self-evident that all collective bargaining activity consumes time and energy. Employees who rise to the level of central participation in union affairs, such as a union negotiator, are unusually vulnerable to management action based upon the premise that the employee's ability to do his job is compromised by the "mere fact" of dual demands on his time. In the face of such an explanation, which will always be plausible, it is unduly burdensome to re-

quire that the aggrieved employee prove the existence of a subjective antiunion animus on the part of the employer. Rather, it should rest upon the employer to show that sound business reasons provided an independent basis for its action.

The United States Supreme Court has recently held that some employer conduct is so inherently destructive of collective bargaining rights that "it carries with it a strong inference of impermissible motive ... even if an employer comes forward with a nondiscriminatory explanation for its actions." *Metropolitan Edison Co. v. NLRB,* —— U.S. ——, ——, 103 S.Ct. 1467, 1474, 75 L.Ed.2d 387 (1983). There the Supreme Court also said that:

> On the other hand, if the adverse effect of the discriminatory conduct on employee rights is " 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct."

—— U.S. at ——, 103 S.Ct. at 1474, *quoting NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027, 1035 (1967). In cases of implied antiunion animus the Supreme Court held that the employer's business justification should be balanced against the invasion of collective bargaining rights. *Id.* See also *Great Dane Trailers,* 388 U.S. at 33–34, 87 S.Ct. at 1797, 18 L.Ed.2d at 1034–35; *NLRB v. Brown,* 380 U.S. 278, 287, 85 S.Ct. 980, 985, 13 L.Ed.2d 839, 846–47 (1965).[2]

---

**1.** The ALRA found that Petersen's union activity was not a factor in the University's decision to deny him summer employment. Given the documentary evidence to the contrary, this finding is not supported by substantial evidence on the whole record. *See City of Fairbanks, v. Alaska P.U.C.,* 611 P.2d 493, 495 (Alaska 1980).

**2.** *See* Gorman, Labor Law at 133 (1979):

In effect, section 8(a)(1) could be rewritten as follows: It shall be an unfair labor practice for an employer to take action which, regardless of the absence of antiunion bias, tends to interfere with, restrain, or coerce a reasonable employee in the exercise of the rights guaranteed in section 7, provided the

action lacks a legitimate and substantial justification such as plant safety, efficiency or discipline. Thus construed, section 8(a)(1) requires that the Board strike a balance between the interests of the employer—which are not specifically accorded weight in the statute but which Congress surely intended be considered in administering a statute designed to further industrial peace and efficiency—and the interests of the employees in a free decision concerning their collective bargaining activities.

Gorman notes that the test for "coercion" is objective. It is not necessary for the employee to show actual coercion, or employer intent to coerce. "[I]t is sufficient if the General Coun-

In my view the failure of the University to hire Petersen for the summer 1979 term was an action which carried serious implications for Petersen. To the extent that the denial was explained in terms of Petersen's conflicting obligations to the union, its tendency to discourage union activity was compounded. In the spectrum of employer actions described in *Metropolitan Edison,* I would not view the adverse impact upon Petersen's collective bargaining rights as "comparatively slight." Rather, I consider the denial of employment as the type of decision which is "inherently destructive of protected employee rights." In such an instance a federal court would not reject Petersen's claim, as the majority has done, for his failure to show actual antiunion bias.[3]

AS 23.40.110(a)(1) provides that "a public employer or his agent may not ... interfere ... or coerce an employee in the exercise of his [collective bargaining] rights." Because I view the action taken in this case as coercive, I would order a remand placing the burden upon the University to show that an independent business justification existed for its decision not to hire Petersen, and that this decision would have been taken irrespective of Petersen's activities as a union negotiator. *See NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

sel can show that the employer's actions would tend to coerce a reasonable employee." *Id.* at 132–33.

**3.** *See also NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (June 15, 1983) where the Court upheld the NLRB rule that, under § 8(a)(1), once the employee has shown that his protect-

ed conduct "was a substantial or motivating factor" in the adverse action, the burden of proof shifts to the employer to show "by a preponderance of the evidence that the [adverse action] rested upon the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Id.* at ——, 103 S.Ct. at 2473.