UNIVERSITY OF ALASKA, Appellant,

v.

ALASKA COMMUNITY COLLEGES'
FEDERATION OF TEACHERS,
LOCAL 2404, Appellee.

No. S–9732.

Supreme Court of Alaska.

Feb. 21, 2003.

Thomas M. Daniel, Perkins Coie, LLP, Anchorage, for Appellant.

William K. Jermain, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellee.

Before: MATTHEWS, EASTAUGH, BRYNER and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The University of Alaska Anchorage granted pay increases to non-represented faculty members, but not to union members, to remedy perceived salary inequities. The union filed a grievance that progressed through arbitration. The arbitrator found that the university discriminated against union members by failing to include the members in the equity distributions. The university appealed to the superior court, which confirmed the arbitrator's award. Because the arbitrator erred in his analysis of the nondiscrimination clause of the collective bargaining agreement, we reverse.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 1992 the University of Alaska entered into a collective bargaining agreement (CBA) with the Alaska Community Colleges' Federation of Teachers, Local 2404. The agreement covered faculty members teaching vocational-technical or lower division courses. Under section 7.1 of the CBA, salaries were set by the Board of Regents' policy in effect as of May 8, 1992. Under this policy, represented and non-represented employees were entitled to 3% salary increases subject to legislative approval.

Soon after entering into the CBA, the university faced funding shortfalls. On August 30, 1993, "perceiv[ing a] financial crisis," the regents indefinitely suspended the annual 3% salary increase for all employees, union and non-union. The union filed a grievance, arguing that the suspension of the 3% salary increase was in violation of the CBA. This grievance resulted in arbitration before William Corbett. Based on the provisions of the CBA, Corbett ruled that union employees were insulated from a decision of the regents to suspend the annual raises. Accordingly, the non-represented employees did not receive the annual salary increase, while the union employees did receive the raise.

In August 1995 the regents revised the compensation policy and authorized the administration to develop new regulations to implement the policy. Under the new policy, chancellors were directed to set aside an amount equal to 2.6% of the cumulative value of regular faculty salaries with 1% of that amount earmarked for promotion, retention offers, equity salary adjustments, and extraordinary performance. The remaining 1.6% of the set-aside funds was to be used to fund annual performance-based increases.

As a part of the changes in the compensation guidelines, Chancellor Lee Gorsuch of the Anchorage campus commissioned a study (the Lampman study) in 1996 to identify employees who were underpaid relative to their peers. The study was limited to non-union employees. In response to the study's findings, underpaid non-union employees received a pay adjustment of up to 2.6%. Union employees, who were already receiving a 3% annual increase pursuant to the Corbett decision, did not receive any part of this 2.6% increase.

### B. Proceedings

In 1996 the union and six female faculty members, on their own behalf and on behalf of similarly situated faculty members, filed a grievance (grievance 96–40) under step one of the grievance procedure in the CBA. The grievance alleged that the university had discriminated against the women by paying them salaries lower than those for comparable male faculty members and that the university had violated the non-discrimination clause of the CBA by failing to include union members in the study to identify and compensate underpaid employees.

In 1997 the union filed a second grievance (grievance 97–43) alleging various violations of the CBA. These allegations included claims that the union members were entitled to the same salary increase as non-represented employees and that the university failed to request funds from the legislature for salary increases for union members. A new collective bargaining agreement was entered into in 1997 in which the parties agreed to settle grievance 97–43 "on a non-precedent setting basis by payment of the salary increases to the 26 Faculty Members to the grievance."

A hearing was held on grievance 96–40 before Chancellor Gorsuch, as provided in step two of the CBA's grievance procedures. Chancellor Gorsuch denied the union's grievance in January 1997. Chancellor Gorsuch decided that the grievance was untimely because the CBA required that a grievance be filed within thirty days after the employee became aware of the alleged conduct and the union failed to do so. Chancellor Gorsuch went on to state that, even if the grievance had been timely, the evidence was insufficient to support claims of gender and union discrimination. However, Chancellor Gorsuch did instruct the university administrative staff to conduct a review of the salaries of represented employees that used a methodology similar to that used in the Lampman study.

The union appealed the chancellor's opinion to Arbitrator George Lehleitner, as provided in step three of the CBA's grievance procedures. Lehleitner issued his opinion and award on September 17, 1998. Lehleitner decided that the union failed to establish an actionable claim of gender discrimination, but that the university did violate the terms of the CBA by excluding the union from the Lampman study and the distributions arising from the study. On the issue of timeliness of the grievance, Lehleitner decided that the union failed to file the grievance within thirty days of discovering the gender discrimination, but that the union did file the grievance within a reasonable time after discovering that the Lampman study did not include represented employees.

Lehleitner also decided that, in settling grievance 97–43, the issue of whether the university violated the CBA by failing to request funding from the legislature for 1996 increases for represented faculty pursuant to the Lampman study was settled and that the settling of grievance 97–43 did not settle grievance 96–40. Lehleitner ordered the university to undertake "a separate Lampman type study of the [union] faculty and then apply the 2.6% equity adjustment monies to correct whatever inequalities are identified retroactive to January 1, 1996."

The university filed a motion to vacate or modify the arbitrator's award in superior court, as arguably permitted by part four of grievance step three in the CBA, which states that the arbitrator's decision could be appealed "as provided by law." Before the superior court, the university argued that the arbitrator had disregarded the law and exceeded his authority, had impermissibly rewritten the CBA, and had addressed questions that were not before him. For its part, the union asked the superior court to confirm the arbitrator's award with interest from the date of the award. Superior Court Judge John E. Reese rejected the university's arguments, confirmed the arbitrator's award, and directed the university to pay the award with interest accrued.

The university appeals the superior court's decision confirming the arbitrator's award.

## III. STANDARD OF REVIEW

■ We review the superior court's review of the arbitrator's decision *de novo* as it deals with questions of law and contract interpretation.[1] On questions of law, we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[2]

The appropriate standard of review of the arbitrator's decision is a contested issue. The union argues that the CBA—which provides that "[t]he decision of the arbitrator shall be ... appealable as provided by law"—should be interpreted as incorporating the Uniform Arbitration Act's[3] provisions for review. The Uniform Arbitration Act (the Act) provides the most highly deferential standard. Under it, the arbitrator's findings of fact and law are not reviewable;[4] judicial review may only be had for fraud, corruption, and the like.[5] The university reads the CBA's provision that the arbitrator's award is "appealable as provided by law" differently than the union. According to the university, this provision rejects incorporation of the Act and instead requires application of the common law to appeals of arbitrators' decisions. Accordingly, the university argues for a less deferential standard of review than that provided under the Act. Because arbitration is compulsory in this case, the university claims that the abuse of discretion standard should apply.

■ We agree with the university that the CBA does not incorporate the Act and its fraud/corruption standard. In specifying the

1. *Marathon Oil Co. v. ARCO Alaska, Inc.*, 972 P.2d 595, 600 (Alaska 1999); *Ahtna, Inc. v. Ebasco Constructors, Inc.*, 894 P.2d 657, 660 (Alaska 1995).

2. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

3. AS 09.43.010–180.

4. *Ahtna, Inc.*, 894 P.2d at 660–61.

5. AS 09.43.120 provides that a court may vacate an award only if it was "procured by fraud or other undue means," if there was "evident partiality" or "corruption in any of the arbitrators or misconduct prejudicing the rights of a party," if the arbitrators "exceeded their powers," or if there were other substantial irregularities.

law applicable to step three grievance procedures, the CBA provides that such procedures "will be resolved by arbitration under AS 09.43.010–180 [6] and as provided by the Agreement." But on the issue of appeal of the arbitrator's award, the CBA states simply that "[t]he decision of the arbitrator shall be . . . appealable as provided by law." Had the drafters of the CBA wished to limit appellate review to that allowed under the Act, they would have used the kind of language that they used in setting out the law applicable to step 3 grievance procedures; they would have stated that appellate review is available "under the Uniform Act" or "under AS 09.43.010–180" rather than "as provided by law."

■ Our decision that the fraud/corruption standard does not apply leaves the question of what standard to apply. While we have held that, in general, grievance arbitration is reviewed under the gross error standard of review,[7] we have not decided whether there should be a different standard for compulsory grievance arbitration, the present case, as opposed to non-compulsory grievance arbitration. However, we need not decide in this case whether the more deferential "gross error" standard or the less deferential "arbitrary and capricious" standard of review applies, for both tests here lead to the same result. As set out in part IV, we must reverse even under the more deferential "gross error" standard. In these circumstances, as we have done before, we leave the question open because the facts of the case require a reversal under either standard:

> In State v. Public Safety Employees Association, 798 P.2d 1281 (Alaska 1990), we were not required to address the question whether compulsory grievance arbitration

proceedings might be subject to a standard of review other than gross error. PSEA [v. State, 895 P.2d 980 (Alaska 1995)] does not resolve that question, but does note that this court has applied the gross error standard to grievance arbitration proceedings. See PSEA, at 984. We choose not to address in this case whether compulsory grievance arbitration proceedings might be subject to a standard of review other than gross error, as we again are not required to do so.[8]

## IV. DISCUSSION

**The Arbitrator Misapplied Section 3.2 of the CBA.**

The university argues that, in order to rule against it, Lehleitner was obligated to find that it illegally discriminated against union employees when it offered salary increases to non-union employees without making similar payments to union employees. In the context of this case, Lehleitner was required to find that the university's acts constituted discrimination prohibited by law.

■ But Lehleitner's decision includes no such finding. He acknowledges that his "analysis begins and pretty much ends with the 'Non Discrimination' article contained in the [CBA]." The non-discrimination article provides:

> Neither the University nor the Union shall discriminate on any basis prohibited by law, including union-related activity.

In order to constitute a violation of this clause, activity must consist of discrimination already prohibited by law.[9]

■ The only discrimination that the arbitrator found was that, in the course of administering the university, its officials drew

---

6. AS 09.43.010–180 is the entirety of the Uniform Arbitration Act.

7. *State v. Pub. Safety Employees Ass'n, Local 92,* 798 P.2d 1281, 1284 (Alaska 1990). " 'Gross error' is defined as 'only those mistakes which are both obvious and significant.' " *Pub. Safety Employees Ass'n, Local 92 v. State,* 895 P.2d 980, 984 (Alaska 1995), quoting *City of Fairbanks v. Rice,* 628 P.2d 565, 567 (Alaska 1981).

8. *Pub. Safety Employees Ass'n, Local 92 v. State,* 902 P.2d 1334, 1336 n. 2 (Alaska 1995).

9. Differing treatment based on union membership is not per se impermissible, but is prohibited by law under certain circumstances. For example, under AS 23.40.110(a)(3), it is a violation of the Public Employment Relations Act to discriminate against public employees in order to encourage or discourage union membership. In *Alaska Community Colleges' Federation of Teachers, Local No. 2404 v. University of Alaska,* 669 P.2d 1299 (Alaska 1983), we held that, to establish a violation of AS 23.40.110(a), the employer's action generally must have been based on an anti-union motive. *Id.* at 1307. We stated that "[o]nly where the employer's conduct is 'inherently destructive' of important employee interests

distinctions between union and non-union employees. Indeed, the arbitrator specifically found no evidence of bad faith on the university's part: He stated that the university in attempting to redress past salary inequities acted in a "fair and equitable" manner. As Lehleitner did not find any evidence of discrimination prohibited by law or of any anti-union animus, it was gross error to find a violation of the nondiscrimination clause of the CBA.

The arbitrator grossly erred in his analysis of section 3.2. Therefore, we need not reach the other issues raised by the university.

## V. CONCLUSION

Because the arbitrator misapplied section 3.2 of the CBA, we REVERSE the award and REMAND with instructions that the grievance be dismissed. The university was entitled to take steps in good faith to address issues of pay inequity without risking an arbitrator's decision that it had violated the non-discrimination clause of the CBA.

FABE, Chief Justice, not participating.

is proof of an antiunion motive unnecessary under that section." *Id.*