VIRACON, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 83–2134.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

VIRACON, INC., Respondent.

Nos. 83–2134, 83–2424.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1984.

Decided June 20, 1984.

As Amended July 26, 1984.

Allen E. Christy, Jr., Hadlick & Hoedeman, P.C., Minneapolis, Minn., for petitioner.

Patrick Szymanski, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

Before WOOD and COFFEY, Circuit Judges, and HENLEY, Senior Circuit Judge.*

HENLEY, Senior Circuit Judge.

Viracon, Inc. petitions for review of an order of the National Labor Relations Board. The NLRB cross-petitions for enforcement of the order. Because we are unable to conclude that the Board's order is supported by substantial evidence on the record as a whole, *NLRB v. Mutual Maintenance Service Co.*, 632 F.2d 33, 37–38

* The Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals, Eighth Circuit, is sitting by designation.

(7th Cir.1980), we deny the Board's petition for enforcement.

An Administrative Law Judge (ALJ) held that Viracon violated § 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(4), when it fired Margarita Negrete. The ALJ found that Viracon fired Negrete because she gave testimony against Viracon in another NLRB proceeding. The ALJ recommended that Viracon be ordered to reinstate Negrete with back pay. The Board adopted the ALJ's findings and recommendation. Viracon petitions this court for review, arguing that some of the evidence relied upon by the ALJ was inadmissible and that the NLRB failed to make a prima facie case that Negrete was fired because of her testimony before the NLRB. The Board cross-appeals for enforcement of the order, arguing that substantial evidence supports the ALJ's decision.

## BACKGROUND

Negrete was hired by Viracon's predecessor in 1973. In 1979 an affiliate of the International Brotherhood of Teamsters began an organizing campaign at the plant in Bensenville, Illinois where Negrete worked. Negrete signed a union authorization card and attended one union meeting during this campaign. There is no indication that she was a leader or especially active in the campaign.

Unfair labor practices charges were brought against Viracon arising out of its conduct during this campaign, and Negrete testified at the proceedings before an ALJ in May or June of 1980. The ALJ in that case found that Viracon had violated § 8(a)(1) of the National Labor Relations Act. The ALJ's decision was issued on November 26, 1980. That decision was adopted by the Board. *Viracon, Inc.*, 256 NLRB No. 37 (1981).

On November 23, 1980 Negrete fell in her apartment. She lost consciousness and suffered a broken nose and a cut on her forehead. She received stitches for her cut at a hospital and then returned home. On November 25 she felt weak and dizzy and returned to the hospital. She was hospitalized for treatment of a concussion. A hospital employee called Viracon on November 25 to notify them of Negrete's hospitalization, and Negrete called in on November 26. Negrete returned to work on December 9. There is no evidence that Viracon was in any way concerned about the absence or considered it unexcused.

Negrete worked regularly from December 9 until January 6. The state of her health during these few weeks is unclear from the record and was not resolved by the ALJ. Negrete testified at different times that she felt "good," "all right," and "weak" during this period. Negrete requested time off during the holidays, but decided to continue working when only leave without pay was offered. At any rate, on January 6, 1981 Negrete felt very dizzy. She called Viracon and spoke to production supervisor Don Schmidt. Negrete told Schmidt she was unwell and had to see a doctor; Schmidt told her to let him know when she was ready to return to work.[1]

Negrete saw Dr. David Ginsburg, the physician who treated her during her hospital stay, on January 9. He found nothing wrong, but considered that Negrete was still suffering from the concussion. He advised her to rest a few days. On January 16 Negrete called Viracon and spoke with a leadman named Benny. She told Benny that she would return to work on January 19.

During this second absence Schmidt apparently became concerned. Knutson testified that on January 15 Schmidt told him that Negrete had been absent since Janu-

---

**1.** Viracon disputes Negrete's testimony that Schmidt told her to call when she could come back to work, but the only contradictory testimony was that of David Knutson, Viracon's director of industrial relations, who testified that Schmidt told Knutson that Schmidt told Negrete to call back when she knew what was wrong. The ALJ specifically credited Negrete on this point, and there are no extraordinary circumstances which would justify overturning that finding. *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982).

ary 6, that she had called in on that day but had not called since, that some company employees said Negrete was out of town, and that efforts to reach Negrete were unsuccessful because her telephone was disconnected. Knutson said he agreed with Schmidt that Negrete should be fired unless there were mitigating circumstances, and he sent Negrete a telegram stating that she would be terminated unless she had a good excuse for her long absence. The telegram was returned to Viracon as undeliverable because Negrete's telephone was disconnected. A mailgram was then sent to Negrete, which she received on January 18.

Negrete returned to work on January 19. After she worked for an hour, Schmidt called her off the floor to discuss her absences. Negrete gave Schmidt and Knutson a written excuse from Dr. Ginsburg, which stated that she had been under his care for a concussion. Knutson testified that he had had several concussions while in college and that in his experience one did not recover from a concussion and then have relapses. Knutson questioned Negrete about her illness and then told her that she was being suspended until she could be examined by another doctor to verify her medical problems. Knutson testified that he told Negrete she would be reinstated with back pay if her excuse was found to be valid.

Viracon set up an appointment with a Dr. Pevsner. Dr. Pevsner stated that he had never seen a case in which a person with a concussion would fully recover and then have a recurrence of symptoms.[2] He told Viracon that in view of Negrete's return to work in December he did not think that she had been ill in January. Negrete was then fired.

2. Dr. Ginsburg also testified that he had never heard of a person recovering from a concussion and then suffering a relapse. Dr. Ginsburg indicated that he assumed Negrete had continuing symptoms rather than some sort of relapse.

3. The Board contends that the ALJ also relied on the fact that Negrete was the only employee who had testified against Viracon who was still

## DISCUSSION

It should be noted first that the ultimate issue is not whether Negrete was really sick in January, 1980. What is most important is whether the company fired Negrete solely because she had excessive, unexcused absences or whether her discharge was at least in part retaliation for her NLRB testimony. Cf. Airborne Freight Corp. v. NLRB, 728 F.2d 357, 358 (6th Cir.1984) (ALJ's conclusions that company should have believed employee's story and that discharge was too harsh a remedy are irrelevant). The ALJ correctly recognized this distinction.

In finding that Viracon fired Negrete in retaliation for her testimony in a prior NLRB proceeding, the ALJ relied on three facts: (1) the company's animosity toward the union, as shown by the earlier finding of unfair labor practices; (2) the closeness in time between the issuance of the ALJ's opinion in the prior proceeding and Negrete's suspension; and (3) Negrete was treated more harshly than other employees in similar circumstances.[3]

### 1. Viracon's union animosity.

■ The ALJ relied on the previous finding that Viracon had committed unfair labor practices during a union campaign to conclude that Viracon was biased against the union.

Viracon's first point concerns the admission into evidence of the record of the prior proceeding. Viracon argues that the record was prejudicial and that it should only have been admitted for the purposes of showing that Negrete testified.

Our reading of the ALJ's opinion shows us that in fact the ALJ limited her consideration of the record of the prior proceeding to the fact that Negrete testified. This

working for Viracon. As we read the ALJ's opinion, she did not rely on that fact. In any event, that fact only raises a suspicion of unlawful motivation, and we doubt that it would be proper to draw an adverse inference from that fact alone. See Eastern Engineering & Elevator Co. v. NLRB, 637 F.2d 191, 199 (3d Cir.1980).

was entirely proper. The fact that Negrete testified against Viracon at a hearing before an ALJ gives rise to the inference that Viracon knew of Negrete's protected activity. Therefore, we need not discuss whether a more extensive consideration of the testimony and exhibits in that proceeding would have been proper.

■ Viracon next argues that it was improper to consider the prior finding of unfair labor practices because it occurred outside the six-month limitations period established by the Act. 29 U.S.C. § 160(b). Certainly if the only evidence supporting the Board's finding that Negrete was fired for her NLRB testimony was an old unfair labor practices charge, the finding would not be supported by substantial evidence. *E.g., J.P. Stevens & Co. v. NLRB*, 638 F.2d 676, 680 (4th Cir.1980); *see Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416–17, 80 S.Ct. 822, 826–827, 4 L.Ed.2d 832 (1960). However, an employer's history may certainly be considered as background and may be used by the ALJ, if there is other supporting evidence, to buttress a finding that the employer was biased against the union. *Tama Meat Packing Corp. v. NLRB*, 575 F.2d 661, 662–63 (8th Cir.1978); *cf. NLRB v. Sure-Tan, Inc.*, 672 F.2d 592, 600 (7th Cir.1982) (contemporaneous unfair labor practices relevant), *cert. granted*, 460 U.S. 1021, 103 S.Ct. 1270, 75 L.Ed.2d 492 (1983).

■ In this case, there was no other evidence that Viracon was biased against the union. The prior proceedings concerned events which occurred some fifteen months before Negrete's discharge. While one might suspect that Viracon was not enamoured of the union, the result of the prior proceeding does not constitute substantial evidence to support the finding that Viracon was biased against the union.

2. Closeness in time.

■ The ALJ relied on the fact that Negrete was dismissed some six weeks after the ALJ in the unfair labor practices matter issued his opinion. Closeness in time between the protected activity and the discharge is certainly relevant and may be considered as evidence of unlawful motivation. *E.g., Herman Bros. v. NLRB*, 658 F.2d 201, 210 (3d Cir.1981); *Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 126 (6th Cir.1980).

The ALJ noted that the time between the discharge and the ALJ's adverse decision was only six weeks. However, the protected activity on Negrete's part was not the issuance of the ALJ's opinion, but rather her testimony before the NLRB. That had occurred some seven months, not six weeks, before her discharge. The weight that should be accorded this evidence is further diminished by the fact that Negrete received no discipline from the company for her first period of extended sick leave caused by her concussion even though that absence occurred after she testified.

3. Whether Negrete was treated differently than other employees.

■ The ALJ found that Viracon had never before refused to accept an employee's medical excuse for an absence or referred an employee to a company doctor for a second opinion. The ALJ also found that Negrete was the only long-term employee fired for excessive absenteeism without a prior warning. The ALJ relied upon Viracon's personnel files in making these determinations.

Viracon makes several arguments concerning the admissibility of the personnel records. Viracon asserts that the documents were irrelevant, hearsay, and incomplete and misleading. Viracon also argues that the ALJ admitted the medical excuses and attendance records for the limited purpose of showing they were in Viracon's files, and that the ALJ erred in considering them for other purposes. We reject Viracon's contentions.

How Viracon treated other employees in situations similar to Negrete's was, of course, highly relevant. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 2475–76, 76 L.Ed.2d 667 (1983); *NLRB v. Florida Tile Co.*, 692

F.2d 35, 36 (6th Cir.1982); *Herman Bros,* 658 F.2d at 209–10; *Head Division, AMF Inc. v. NLRB,* 593 F.2d 972, 975–76 (10th Cir.1979). A showing that Negrete was treated just like other employees were treated would have indicated the company acted without improper motivation, *see Airborne Freight,* 728 F.2d at 358, and a showing that Negrete was treated more harshly than other employees in similar situations would indicate the company acted in response to Negrete's NLRB testimony.

The Board issued a subpoena requiring Viracon to present its records which would show attendance and personnel action taken because of poor attendance. The subpoena also required Viracon's records of medical excuses and personnel action taken because of unverified absences. Viracon did not move to quash the subpoena, and provided the Board with several boxes of personnel files. However, Viracon refused to state that it had complied with the subpoena or that it had submitted all the requested documents.

An NLRB attorney went through the Viracon files and submitted as exhibits various portions of the documents. Knutson testified under questioning by the Board attorney that he often relied on the information in the files, but that the information often was not complete. The Board attorney introduced each document through Knutson's testimony.

We agree with the ALJ that Knutson's testimony provided a sufficient basis for the admission of the records under Fed.R.-Evid. 901 and 803(6). We see no need to repeat her analysis.

Viracon argues that the documents were misleading and incomplete and should not have been considered. Viracon points to Knutson's testimony that the records were incomplete and argues that there might be other evidence on some of the people whose files were introduced. If so, and if that evidence would have weakened the Board's proof that Negrete was treated differently from other employees, it was up to Viracon to present it. Viracon had equal, if not better, access than the NLRB to its personnel records. The records were clearly relevant and Viracon had full opportunity to cross-examine Knutson about the documents and, had it so desired, to introduce evidence which would have disputed the Board's showing that Negrete was treated differently. Viracon cannot rest its claim that the files were inadmissible on mere assertions that the records were incomplete.

The evidence of the personnel files shows that Negrete was the only employee in the Bensenville plant who was required to see a company doctor to verify her medical excuse. The files also showed two other employees were not fired even though they had longer absences than Negrete and their files did not contain any kind of medical excuse; the files did indicate that the employees were recovering from off-the-job accidents. The files show that the only employees discharged for absenteeism without prior warning had been employed by Viracon for short periods, and that no long term employees of Viracon had been discharged for absenteeism without a prior warning. This evidence shows that Negrete may have been treated differently than other employees at the Bensenville plant.

However, there was evidence presented which indicated that Negrete had not been treated differently. Knutson testified that on two other occasions he had required verification of medical excuses. The workers whose absences were required to be verified were employed at a different facility, but the facility was owned by Viracon and run in the same manner. This undermines the conclusion that Negrete was treated differently from other employees. Further, the files of the two employees with long absences show that both were off work while recovering from accidents. Neither file shows any suspicious circumstances which would justify concern by Viracon that the absences were not valid; as discussed *infra,* that is not the case here.

The evidence against Viracon is that it may have treated Negrete differently from

other employees in dismissing her for unexcused absences without a prior warning. Negrete was the first Bensenville employee, but not the first company employee, required to verify her medical excuse. The discharge took place some seven months after Negrete testified against the company in an unfair labor practices proceeding.

Certainly proof that an employee who seven months earlier testified against the employer has been treated more harshly than other employees would be sufficient to allow the Board to infer that the employee was so treated for an improper purpose. *See Transportation Management Corp.,* 103 S.Ct. at 2475–76. But in this case the evidence of disparate treatment rises only to the level of a possibility. The Board is entitled to draw reasonable inferences from the facts, but we do not think it reasonable to infer improper motive from the mere possibility that an employee was treated more harshly than other employees. We have serious doubts that the Board's finding of a prima facie case of improper discharge is supported by substantial evidence.

Even assuming the Board did meet its burden, we conclude that Viracon met its burden to show that Negrete would have been discharged regardless of its "forbidden motivation." *Transportation Management,* 103 S.Ct. at 2474. As the ALJ recognized, the important issue was whether Viracon believed that Negrete had no valid reason for her failure to be at work and whether Viracon discharged her for that reason.

Viracon argues that it discharged Negrete because Schmidt and Knutson believed Negrete had been out of town during her absence and because her medical excuse was inconsistent with Knutson's personal knowledge of the medical effects of a concussion. Had the ALJ believed Knutson on these points, it would have been enough to rebut the prima facie case. However, the ALJ explicitly stated that she did not believe Knutson when he testified he suspended Negrete because of his knowledge of concussions.

The ALJ's decision to discredit Knutson on this point was based on her belief that Knutson was tailoring his answers to Viracon's defense theory. However, this finding ignores several facts which tend to support Knutson's version of the events.

First, all of the medical evidence supported Knutson's testimony that it was his experience that a person who recovers from a concussion will not suffer from a recurrence of symptoms. Both Dr. Pevsner and Dr. Ginsburg agreed that this is so. Thus, a person with some knowledge of concussions might have reasonable cause to doubt Negrete's medical excuse.

Second, there were rumors at the plant that Negrete was out of town during this absence. Knutson knew that Negrete had earlier requested time off and then not taken it when it developed it was available only without pay. Viracon's suspicions about Negrete's absence were strengthened when efforts to reach Negrete by telephone failed.[4]

In these circumstances, we believe it was improper for the ALJ to reject Knutson's testimony about Negrete's concussion out of hand. His testimony was supported by the medical evidence. Further, the ALJ did not recognize that the company already had reasonable grounds to be suspicious about Negrete's absence without the medical excuse.

We simply are unable to conclude that there is substantial evidence supporting the

---

4. The record was unclear as to whether Viracon had Negrete's correct telephone number at this time. Knutson testified that the number Viracon had had been disconnected, and this testimony was corroborated by an undelivered Western Union telegram. Knutson also testified that when Negrete was suspended, she gave the company a new phone number that was unlisted, and told them she had been having problems with harassing phone calls. Negrete merely testified that she had provided the company with her phone number; she did not testify concerning the change in telephone numbers and which number she had given the company. Her testimony is not inconsistent with Knutson's, and we see no reason for the ALJ to have disbelieved him on this point.

Board's decision. The evidence that Viracon fired Negrete for an improper purpose is exceedingly weak. It is based almost solely on the fact that Negrete testified in another NLRB proceeding and the possibility that she may have been treated more harshly than other employees at the Bensenville plant, but not more harshly than employees at other plants. Viracon's explanation of Negrete's firing was rejected by the ALJ without consideration of important circumstances which supported Viracon's story.

Evidence which undermines the Board's findings must be taken into account in evaluating the record as a whole. When the credible evidence in Viracon's favor is considered, the evidence supporting the Board's conclusions cannot be characterized as substantial.

Accordingly, the Board's petition for enforcement must be denied.